Nicholas J. Henderson, OSB#074027
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 200
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>Matthew Read King,<br><br>Debtor | Case No.     13-33284-tmb7<br><br>Adv. No.     13-03249-tmb |
| Andreas Papachristopoulos and Demetrios Papachristopoulos,<br><br>Plaintiffs,<br><br>v.<br><br>Matthew Read King,<br><br>Defendant. | DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>ORAL ARGUMENT REQUESTED |

### I.  LBR 7007-1(a) CERTIFICATION

The parties made a good-faith effort through telephone conferences to resolve the dispute and have been unable to do so.

### II.  MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, Defendant Matthew King, by and through his counsel, Nicholas J. Henderson and Motschenbacher & Blattner, LLP, hereby moves this Court for Summary Judgment on all of the Plaintiff's Claims.

PAGE 1 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This motion is supported by Defendant's Memorandum in Support of Motion for Summary Judgment, Defendant's Concise Statement of Material Facts, and the Declaration of Matthew R. King accompanying this motion.

DATED: April 8, 2014.

MOTSCHENBACHER & BLATTNER, LLP

 /s/ Nicholas J. Henderson
Nicholas J. Henderson, OSB # 074027
Of Attorneys for Defendant Matthew Read King

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on April 8, 2014, I served the foregoing DEFENDANT'S MOTION FOR SUMMARY JUDGMENT on the following:

Natalie Carol Scott
The Scott Law Group
497 Oakway Rd Ste 245
Eugene OR  97401

        Attorneys for Plaintiff Andreas Papachristopoulos

**[X]  Via First Class Mail**

[  ]  Via Facsimile

[  ]  Via Hand Delivery

**[X]  Via ECF Notification**

[  ]  Via Electronic Mail to: nscott@scott-law-group.com

DATED: April 8, 2014.

                                    MOTSCHENBACHER & BLATTNER, LLP

                                      /s/ Nicholas J. Henderson
                                      Nicholas J. Henderson, OSB #074027
                                      Attorney for Defendant Matthew Read King

Nicholas J. Henderson, OSB#074027
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 200
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>MATTHEW READ KING<br><br>        Debtor | Case No.      13-33284-tmb7<br><br>Adv. No.      13-03249-tmb |
| ANDREAS PAPACHRISTOPOULOS<br>AND DEMETRIOS<br>PAPACHRISTOPOULOS,<br><br>        Plaintiffs,<br><br>   v.<br><br>MATTHEW READ KING,<br><br>        Defendant. | DECLARATION OF DEFENDANT<br>MATTHEW KING IN SUPPORT OF<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT |

I, Matthew Read King, hereby declare the following under penalty of perjury:

1.      I am the defendant in the above-captioned adversary proceeding. From November 18, 2009, to May 5, 2011, I was also a member and manager of Orion Agency, LLC.

2.      I am an Oregon resident, over the age of 18, and I have personal knowledge of the facts stated in this declaration, and would testify to the same if called to do so.

PAGE 1 – DECLARATION OF STEVE KING IN SUPPORT OF DEFENDANT'S MOTION FOR
        SUMMARY JUDGMENT

3.      In early 2009, my brother Steve King and I began having discussions with Andreas Papachristopoulos ("Plaintiff"), regarding the possibility of purchasing Plaintiff's business, Orion Ship Agency, LLC.

4.      After several discussions, my brother and I reached an agreement to purchase Plaintiff's business.  The agreement was that my brother and I would form a corporation that would purchase the assets of Orion Ship Agency, LLC.  Also, the agreement was that Plaintiff would provide consulting services to the new corporation, which would enable my brother and I to learn the shipping agency business from Plaintiff, and develop personal business relationships with Orion Ship Agency LLC's principal customers.  The agreement was also to prevent Plaintiff from engaging in competing business.

5.      On May 10, 2009, my brother and I signed an Agreement for Sale and Purchase of Business Assets, and a Consulting Agreement (together, the "Original Contracts").  True and correct copies of the Original Contracts are attached hereto as Exhibit 1.

6.      After the Original Contracts were signed, my brother and I began to operate the shipping agency business, using the same business name, with Plaintiff acting as our consultant. It was agreed between myself, my brother, and Plaintiff, that the change in business ownership should not be revealed to the industry or the public.  It was our belief that the shipping agency industry is primarily reputation-driven, and that Plaintiff's reputation in the industry was critical to the continued success of our new business.  The plan was to reveal the ownership transition after the consulting agreement term had expired, which—with Plaintiff's help, would allow my brother and I to establish our own reputation in the industry.

7.      At all times, it was my intent that the assets of Orion Ship Agency, LLC would be purchased by a corporation or other business entity that my brother and I would form.  It was my

intent that the parties to the Original Contracts be the new corporation and Orion Ship Agency, LLC. It was never my intent to personally be a party to the Original Contracts.

8.      On November 18, 2009, my brother and I organized Orion Agency, LLC ("Orion").

9.      On February 10, 2011, Plaintiff, my brother and I signed an amended Agreement for Sale and Purchase of Business Assets (the "Sale Agreement") and an amended Consulting Agreement (the "Consulting Agreement"). The Sale Agreement and the Consulting Agreement were both back-dated to January 1, 2010, as it was the parties' intent that the Sale Agreement and the Consulting Agreement were to replace the Original Contracts. Furthermore, in addition to making substantive changes to the agreements, it was the parties' intent to clarify that Plaintiff's contracts were with Orion, not myself or my brother personally. A true and correct copy of the Sale Agreement is attached hereto as Exhibit 2. A true and correct copy of the Consulting Agreement is attached hereto as Exhibit 3.

10.      In late April of 2011, my brother and I agreed that Orion would purchase my membership interest in Orion. On April 25, 2011, I received a check from Orion for $15,000. This payment was meant to satisfy any obligation Orion had to me for compensation, and to purchase my membership interest in Orion. A true and correct copy of the check I received is attached hereto as Exhibit 4.

11.      On May 5, 2011, my brother and I signed a document to memorialize the agreement to have Orion repurchase my membership interest. A true and correct copy of this agreement to purchase my membership interest in Orion is attached hereto as Exhibit 5.

12.      Although I was no longer a member or manager of Orion, I was regularly asked by my brother to help with Orion's company operations. On many occasions after May of 2011,

my brother asked me to help with the various tasks needed to conduct Orion's business. Usually, my brother would ask me to assist him with Orion's operations if he was unavailable or out of town. My brother also asked me for advice on many occasions, regarding business operations or business strategy. I helped my brother, as requested, but I was not an employee, member or manager of Orion. I helped my brother out of love and affection for my brother, and I was not compensated for my help. However, Orion did reimburse me for out of pocket expenses and for mileage driven when I helped my brother.

13.     In late 2012 and early 2013, Orion engaged in negotiations to purchase North American Shipping Agency LLC ("NASA"), a competing business. At my brother's request, I participated in these negotiations. During the negotiations, I witnessed Plaintiff offer several ideas for how Orion could purchase NASA, and also witnessed Plaintiff offer to loan money to Orion for the transaction. Ultimately, Orion did not purchase NASA, and it was purchased by Plaintiff's son, Demetrios Papachristopoulos.

14.     In June of 2013, my brother informed me that he had decided to obtain new employment. My brother asked me to take over as day to day operations manager for Orion, because his anticipated work schedule would not allow him to devote sufficient attention to Orion's business. I agreed to do so, and I was paid $4,000 per month in June and July of 2013, as a fee for managing the operations of Orion.

15.     On June 25, 2013, Orion filed a lawsuit in the Circuit Court for the State of Oregon, Multnomah County. Orion's complaint alleges that Plaintiff attempted to circumvent the non-competition covenants in the Consulting Agreement, by helping his son purchase and operate NASA and in otherwise interfering with Orion's purchase of NASA. The complaint also alleged that Plaintiff deliberately interfered with Orion's business by making false, misleading

and negative statements to Orion's clients. Orion's complaint alleges damages in excess of $3.2 million. A true and correct copy of Orion's complaint is attached hereto as Exhibit 8. I wrote and signed Orion's retainer check to Orion's attorney for the commencement of the lawsuit. This action was taken at my brother's direction and with his express authorization.

16.     At no time during my involvement with Orion did the company agree to hold money in trust for Plaintiff. Moreover, at no time during my involvement with Orion did the company taken money or other property that belonged to Plaintiff.

17.     At no time have I agreed to hold money in trust for Plaintiff, nor have I received any of Plaintiff's funds to hold in trust. Moreover, at no time have I taken money or other property that belonged to Plaintiff.

18.     Plaintiff's two contracts—the Sale Agreement and the Consulting Agreement—are between Plaintiff and Orion. Neither my brother nor myself are parties to the Sale Agreement or the Consulting Agreement.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED this 31st day of March, 2014.


                                        /s/ Matthew King
                                        Matthew King, Declarant

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 8, 2014, I served the foregoing **DECLARATION OF DEFENDANT MATTHEW KING IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the following:

Natalie Carol Scott
The Scott Law Group
497 Oakway Rd Ste 245
Eugene OR  97401

**[X] Via First Class Mail**

[   ] Via Facsimile

[   ] Via Hand Delivery

**[X ] Via ECF Notification**

[   ]  Via Electronic Mail to: nscott@scott-law-group.com

DATED: April 8, 2014.

                               MOTSCHENBACHER & BLATTNER, LLP


                                /s/ Nicholas J. Henderson
                               Nicholas J. Henderson, OSB #074027
                               Attorney for Defendant Matthew Read King

Nicholas J. Henderson, OSB#074027
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 200
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>MATTHEW READ KING<br><br>       Debtor | Case No.     13-33284-tmb7<br><br>Adv. No.     13-03249-tmb |
| ANDREAS PAPACHRISTOPOULOS<br>AND DEMETRIOS<br>PAPACHRISTOPOULOS,<br><br>       Plaintiffs,<br><br>   v.<br><br>MATTHEW READ KING,<br><br>       Defendant. | DECLARATION OF STEVE KING IN<br>SUPPORT OF DEFENDANT'S MOTION<br>FOR SUMMARY JUDGMENT |

I, Steve, King, hereby declare the following under penalty of perjury:

1.      I am the sole member and manager of Orion Agency, LLC.

2.      I am an Oregon resident, over the age of 18, and I have personal knowledge of the

facts stated in this declaration, and would testify to the same if called to do so.

3.     In early 2009, my brother Matthew King and I began having discussions with Andreas Papachristopoulos ("Plaintiff"), regarding the possibility of purchasing Plaintiff's business, Orion Ship Agency, LLC.

4.     After several discussions, my brother and I reached an agreement to purchase Plaintiff's business.  The agreement was that my brother and I would form a corporation that would purchase the assets of Orion Ship Agency, LLC.  Also, the agreement was that Plaintiff would provide consulting services to the new corporation, which would enable my brother and I to learn the shipping agency business from Plaintiff, and develop personal business relationships with Orion Ship Agency LLC's principal customers.  The agreement was also to prevent Plaintiff from engaging in competing business.

5.     On May 10, 2009, my brother and I signed an Agreement for Sale and Purchase of Business Assets, and a Consulting Agreement (together, the "Original Contracts").  True and correct copies of the Original Contracts are attached hereto as Exhibit 1.

6.     After the Original Contracts were signed, my brother and I began to operate the shipping agency business, using the same business name, with Plaintiff acting as our consultant. It was agreed between myself, my brother, and Plaintiff, that the change in business ownership should not be revealed to the industry or the public.  It was our belief that the shipping agency industry is primarily reputation-driven, and that Plaintiff's reputation in the industry was critical to the continued success of our new business.  The plan was to reveal the ownership transition after the consulting agreement term had expired, which—with Plaintiff's help, would allow my brother and I to establish our own reputation in the industry.

7.     At all times, it was my intent that the assets of Orion Ship Agency, LLC would be purchased by a corporation or other business entity that my brother and I would form.  It was my

intent that the parties to the Original Contracts be the new corporation and Orion Ship Agency, LLC. It was never my intent to personally be a party to the Original Contracts.

8. On November 18, 2009, my brother and I organized Orion Agency, LLC ("Orion").

9. On February 10, 2011, Plaintiff, my brother and I signed an amended Agreement for Sale and Purchase of Business Assets (the "Sale Agreement") and an amended Consulting Agreement (the "Consulting Agreement"). The Sale Agreement and the Consulting Agreement were both back-dated to January 1, 2010, as it was the parties' intent that the Sale Agreement and the Consulting Agreement were to replace the Original Contracts. Furthermore, in addition to making substantive changes to the agreements, it was the parties' intent to clarify that Plaintiff's contracts were with Orion, not myself or my brother personally. A true and correct copy of the Sale Agreement is attached hereto as Exhibit 2. A true and correct copy of the Consulting Agreement is attached hereto as Exhibit 3.

10. In late April of 2011, my brother and I agreed that Orion would purchase Matt's membership interest in Orion. On April 25, 2011, I wrote a check—on behalf of Orion—to my brother for $15,000. This payment was meant to satisfy any obligation Orion had to my brother for compensation, and to purchase my brother's membership interest in Orion. A true and correct copy of the check used to pay my brother is attached hereto as Exhibit 4.

11. On May 5, 2011, my brother and I signed a document to memorialize the agreement to have Orion repurchase Matt's membership interest. A true and correct copy of this agreement to purchase my brother's membership interest in Orion is attached hereto as Exhibit 5.

12. On July 19, 2011, I filed an amended annual report with the Oregon Secretary of State, removing my brother as a member and manager of Orion, and listing myself as the sole

member and manager of Orion. A true and correct copy of the amended annual report is attached hereto as Exhibit 6.

13.     Although he was no longer a member or manager of Orion, I regularly asked my brother to help me with Orion's company operations. On many occasions after May of 2011, I asked my brother to help me with the various tasks needed to conduct the business of Orion. Usually, my brother would assist me handle operations for Orion if I was unavailable, or if I was going to be out of town for family vacations. Also, I asked my brother for advice on many occasions, regarding business operations or business strategy, as I believe that my brother had a good understanding of Orion's operations, and the shipping agency industry in general. My brother helped me as requested, but he was not an employee, member or manager of Orion. My brother was not compensated for his assistance, except that I caused Orion to reimburse him for any out of pocket expenses or mileage he incurred when helping me, and I also caused Orion to pay my brother's cellular phone charges.

14.     In late 2012 and early 2013, Orion engaged in negotiations to purchase North American Shipping Agency LLC ("NASA"), a competing business. During these negotiations, Plaintiff offered several ideas for how Orion could purchase NASA, and even offered to loan money to Orion for the transaction. I chose not to have Orion borrow money from Plaintiff, and I did not follow Plaintiff's advice for structuring the NASA purchase, because I did not feel comfortable with the terms proposed, given the risks I perceived.

15.     I caused Orion to make several different offers to purchase NASA or its assets. A true and correct copy of Orion's offer is attached hereto as Exhibit 7. Orion's offers were rejected, and Orion did not purchase NASA.

16.     In June of 2013, I decided to obtain new employment, and I asked my brother to take over for me as day-to-day operations manager for Orion.  My brother agreed to manage Orion's operations, in exchange for a fee of $4,000 per month—the same monthly fee I had been paid for managing Orion since the company's inception.  I authorized my brother to write checks for Orion, and I authorized my brother to write checks to himself for the $4,000 monthly fee.

17.     On June 25, 2013, Orion filed a lawsuit in the Circuit Court for the State of Oregon, Multnomah County.  Orion's complaint alleges that Plaintiff attempted to circumvent the non-competition covenants in the Consulting Agreement, by helping his son purchase and operate NASA and in otherwise interfering with Orion's efforts to purchase NASA.  The complaint also alleged that Plaintiff deliberately interfered with Orion's business by making false, misleading and negative statements to Orion's clients.  Orion's complaint alleges that Plaintiff owes Orion in excess of $3.2 million.  A true and correct copy of Orion's complaint is attached hereto as Exhibit 8.  I authorized my brother to write and sign Orion's retainer check to Orion's attorney for the commencement of the lawsuit.

18.     I believe Orion suffered damages from Plaintiff's actions, as stated in the complaint Orion filed in Multnomah County Circuit Court.  The damages inflicted upon Orion by Plaintiff far exceed the amounts allegedly owed to Plaintiff under the Orion Consulting Agreement.  As a result, Orion has suspended all payments to Plaintiff pending judicial determination of the parties' respective claims.

19.     At no time did Orion agree to hold money in trust for Plaintiff.  Moreover, Orion has never taken money or other property that belonged to Plaintiff.

20.     Plaintiff's two contracts—the Sale Agreement and the Consulting Agreement—are between Plaintiff and Orion.  Neither my brother nor myself are parties to the Sale Agreement or the Consulting Agreement.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED this 6th day of April, 2014.


/s/ Steve King_____
Steve King, Declarant

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2014, I served the foregoing **DECLARATION OF STEVE KING IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the following:

Natalie Carol Scott
The Scott Law Group
497 Oakway Rd Ste 245
Eugene OR  97401

**[X] Via First Class Mail**

[  ] Via Facsimile

[ ] Via Hand Delivery

**[X ] Via ECF Notification**

[  ]  Via Electronic Mail to: nscott@scott-law-group.com

DATED: April 8, 2014.

MOTSCHENBACHER & BLATTNER, LLP


 /s/ Nicholas J. Henderson
Nicholas J. Henderson, OSB #074027
Attorney for Defendant Matthew Read King

Nicholas J. Henderson, OSB#074027
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 200
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>MATTHEW READ KING<br><br>        Debtor | Case No.        13-33284-tmb7 |
| | Adv. No.        13-03249-tmb |
| ANDREAS PAPACHRISTOPOULOS<br>AND DEMETRIOS<br>PAPACHRISTOPOULOS,<br><br>        Plaintiffs,<br><br>    v.<br><br>MATTHEW READ KING,<br><br>        Defendant. | DECLARATION OF NICHOLAS J.<br>HENDERSON IN SUPPORT OF<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT |

I, Nicholas J Henderson, hereby declare the following under penalty of perjury:

1.        I am the attorney for Defendant Matthew King in the above-captioned adversary

proceeding.

2.        I am over the age of 18, and I have personal knowledge of the facts stated in this

declaration, and would testify to the same if called to do so.

PAGE 1 – DECLARATION OF NICHOLAS J. HENDERSON IN SUPPORT OF DEFENDANT'S
        MOTION FOR SUMMARY JUDGMENT

3. Attached as Exhibit 9 to the declaration is a true and correct copy of various emails discussed and authenticated at Plaintiff's March 4, 2014 deposition.

4. Attached as Exhibit 10 to this declaration is a true and correct copy (with highlighting) of the transcript from Plaintiff's March 4, 2014 deposition.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED this 8th day of April, 2014.


/s/ Nicholas J. Henderson
Nicholas J. Henderson, Declarant

## CERTIFICATE OF SERVICE

   I hereby certify that on April 8, 2014, I served the foregoing **DECLARATION OF NICHOLAS J. HENDERSON IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the following:

Natalie Carol Scott
The Scott Law Group
497 Oakway Rd Ste 245
Eugene OR  97401

**[X] Via First Class Mail**

[  ] Via Facsimile

[  ] Via Hand Delivery

**[X ] Via ECF Notification**

[  ]  Via Electronic Mail to: nscott@scott-law-group.com

DATED: April 8, 2014.

            MOTSCHENBACHER & BLATTNER, LLP


             /s/ Nicholas J. Henderson
            Nicholas J. Henderson, OSB #074027
            Attorney for Defendant Matthew Read King

# AGREEMENT FOR SALE AND PURCHASE
## OF BUSINESS ASSETS

DATE:            May 10th, 2009

PARTIES:         Orion Ship Agency, LLC,                           ("Seller")
                    an Oregon limited liability company

                    Andreas Papachristpoulos                 ("Selling Member")
                    13690 SW Tamaway Lane
                    Tigard, OR 97223

                    Matthew King and Stephen King                 ("Buyer")
                    an Oregon corporation to be formed
                    5415 NE 32nd Place
                    Portland, OR 97211

## RECITALS:

      **A.**     Seller operates a business primarily engaged in shipping port representation. Seller owns contract rights and miscellaneous assets used in connection with the operation of its business.

      **B.**     Buyer desires to acquire substantially all the assets used or useful, or intended to be used, in the operation of Seller's business, and Seller desires to sell such assets to Buyer.

      **C.**     Selling Member is the sole member of Seller.

## AGREEMENT:

## SECTION 1. ASSETS PURCHASED; LIABILITIES ASSUMED

      **1.1**    **Assets Purchased.** Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, on the terms and conditions set forth in this Agreement, the following assets ("Assets"):

      **1.1.1** All of Seller's rights under contracts to which Seller is a party and all of Seller's rights including those entered into in the ordinary course of business before the closing date.

      **1.1.2** Seller's name and goodwill.

MKING000429

**Exhibit 1 - Page 1 of 16**
Case 13-03249-tmb    Doc 30    Filed 04/08/14

**1.1.3** All other proprietary rights and intangible property of Seller, including trade names, trade secrets, customer lists, customer relationships, customer agreements, customer understandings, and operating rights and all other such items listed on Exhibit A and all such items acquired by Seller or coming into existence on or before the Closing Date;

**1.1.4** To the extent transferable, all approvals, authorizations, consents, licenses, permits, franchises, tariffs, orders, and other registrations of any federal, state, or local court or other governmental department, commission, board, bureau, agency, or instrumentality held by Seller and required or appropriate for the conduct of the business of Seller, and all such items granted or received on or before the Closing Date;

**1.1.5** All accounts receivable and other receivables of Seller received on or after the Closing Date for Operations originating on or after the Close Date.

**1.1.6** All assignable rights, if any, to all telephone lines and numbers, domain names, logos, identity and brand recognition designs, and email addresses used in the conduct of the business of Seller.

**1.2      Liabilities Assumed.** Buyer shall accept the assignment and assume responsibility for all unfilled orders from customers of Seller assigned to Buyer pursuant to this Agreement and shall assume and perform all of Seller's obligations under the agreements and other contracts listed on Exhibit A. All obligations and liabilities of Seller not described in this Section 1.2 shall remain and be the obligations and liabilities solely of Seller and shall not be assumed by Buyer.

## SECTION 2. PURCHASE PRICE FOR ASSETS

The purchase price for the Assets shall be $5000.00 USD.

## SECTION 3. OTHER AGREEMENTS

At closing, the parties shall execute the following additional agreements:

**3.1** The consulting agreement between Buyer and Selling Member, attached as Exhibit B.

## SECTION 4. SELLER'S AND SELLING MEMBER'S REPRESENTATIONS AND WARRANTIES

As used in this Agreement, *Material Adverse Effect* means a material adverse effect on the business, results of operations, financial position, assets, or prospects of Seller, which shall in any event include any adverse effect on the members' equity, assets, revenue, or net income of Seller in excess of $10,000; and *Material Adverse Change* means any change that has resulted, will result or is likely to result in a Material

Page 2 of 17

MKING000430

**Exhibit 1 - Page 2 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

Adverse Effect."

Seller represents and warrants to the Buyer as follows:

**4.1     Corporate Existence.** Seller is now and on the closing date will be a corporation duly organized and validly existing under the laws of the state of Oregon. Seller has all requisite corporate power and authority to own, operate, or lease the Assets, as the case may be, and to carry on its business as now being conducted.

**4.2     Authorization.** The execution, delivery, and performance of this Agreement have been duly authorized and approved by the members of Seller, and this Agreement constitutes a valid and binding agreement of Seller, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws affecting the enforcement of creditors' rights or by the application of general principles of equity.

**4.3     Financial Statements.** Seller has delivered to Buyer year-end financial statements for Seller's fiscal years ended 2007, and will deliver to Buyer financial statements for all additional interim periods ending before the closing date. The financial statements that have been or will be delivered are in accordance with the books and records of Seller and are true, correct, and complete; fairly present the financial conditions of Seller at the dates of such financial statements and the results of its operations for the periods then ended; and were prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior accounting periods. Except as described in this Agreement, since the close of Seller's last fiscal year and the date, there has been no material adverse change in the financial condition of Seller.

**4.4     Transfer Not Subject to Encumbrances or Third-Party Approval.** The execution and delivery of this Agreement by Seller and Selling Member, and the consummation of the contemplated transactions, will not result in the creation or imposition of any valid lien, charge, or encumbrance on any of the Assets, and will not require the authorization, consent, or approval of any third party, including any governmental subdivision or regulatory agency.

**4.5     Noncancellable Contracts.** At the time of closing, there will be no material leases, employment contracts, contracts for services or maintenance, or other similar contracts existing or relating to or connected with the operation of Seller's business not cancellable within 30 days.

**4.6     Compliance with Codes and Regulations.** Seller and Selling Member have no knowledge that leasehold improvements violate any provisions of any applicable building codes, fire regulations, building restrictions, or other ordinances, orders, or regulations.

MKING000431

**Exhibit 1 - Page 3 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**4.7    Litigation.** Seller and Selling Member have no knowledge of any claim, litigation, proceeding, or investigation pending or threatened against Seller that might result in any Material Adverse Change in the business or condition of the Assets being conveyed under this Agreement.

**4.8    Compliance with Laws.** To the best of its knowledge, Seller has at all relevant times conducted its business in compliance with the its articles of organization, its operating agreement, and all applicable laws and regulations. To the best of Seller's knowledge, Seller is not in violation of any applicable laws or regulations, other than violations that singly or in the aggregate do not, and, with the passage of time will not, have a Material Adverse Effect. Seller is not subject to any outstanding order, writ, injunction, or decree, and Seller has not been charged with, or threatened with a charge of, a violation of any provision of federal, state, or local law or regulation.

**4.9    Labor Matters.** (a) Seller is not a party or otherwise subject to any collective bargaining or other agreement governing the wages, hours, or terms of employment of its employees.

(b)    There is no (1) unfair labor practice complaint against Seller pending before the National Labor Relations Board or any other governmental authority; (2) labor strike, slowdown, or work stoppage actually occurring or, to the best of the knowledge of Seller and the Members, threatened against Seller; (3) representation petition respecting Seller's employees pending before the National Labor Relations Board; or (4) grievance or any arbitration proceeding pending arising out of or under collective bargaining agreements applicable to Seller.

(c)    Seller has not experienced any primary work stoppage or other organized work stoppage involving its employees in the past two years.

**4.10    Tangible Assets**

**4.10.1    Real Property.** Seller does not have any ownership interest in any real property.

**4.10.2    Personal Property.** Assets include all of the assets, properties, and rights owned or used by Seller in the Business or necessary to maintain and operate the Business.

**4.10.3    Intellectual Property.** Seller owns all its Intellectual Property free and clear of all liens, claims, and encumbrances. Seller's use of its Intellectual Property does not create any conflict with or infringe upon any rights of any other person and no claims of conflict or infringement have been asserted against Seller.

**4.11    Leases.** Seller is not a party to any real property lease.

**4.12    Title and Condition of Tangible Assets**

Page 4 of 17

**4.12.1** Seller has good and absolute title to the Tangible Personal Property.

**4.12.3** All Tangible Personal Property has been maintained and operated in accordance with manufacturers' specifications and prudent industry practices, is in a good state of maintenance and repair, ordinary wear and tear excepted, and is adequate for the conduct of Seller's business.

**4.13 Undisclosed Liabilities.** To the best of Seller's and the Members' knowledge, Seller does not have any liability or obligation (whether absolute, accrued, contingent, or other, and whether due or to become due) that is not accrued, reserved against, or disclosed in the Current Balance Sheet, other than liabilities incurred in the ordinary course of business consistent with past practice since the date of the Current Balance Sheet, which individually or in the aggregate will not have a Material Adverse Effect.

**4.14 Absence of Certain Changes or Events.** Since the date of the Current Balance Sheet, there has not been:

**4.14.1** Any Material Adverse Change or any event, occurrence, development, or state of circumstances or facts that could reasonably be expected to result in a Material Adverse Change;

**4.14.2** Any damage, destruction, or casualty loss, whether insured against or not, to any of the Assets;

**4.14.3** Any entry into any agreement, commitment, or transaction (including, without limitation, any borrowing, capital expenditure, or capital financing or any amendment, modification, or termination of any existing agreement, commitment, or transaction) by Seller, except agreements, commitments, or transactions in the ordinary course of business and consistent with past practices or as expressly contemplated in this Agreement;

**4.14.4** Any conduct of business that is outside the ordinary course of business or not substantially in the manner that Seller previously conducted its business;

**4.14.5** Any purchase or other acquisition of property; any sale, lease, or other disposition of property; or any expenditure, except in the ordinary course of business;

**4.14.6** Any incurrence of any noncontract liability known to Seller which, either singly or in the aggregate, is material to the business, results of operations, financial condition, or prospects of Seller;

**4.14.7** Any encumbrance or consent to encumbrance of any property or assets except in the ordinary course of business; or

**4.14.8** Any change in the assets, liabilities, licenses, permits, or franchises of Seller, or in any agreement to which Seller is a party or is bound, which has had or reasonably could be expected to have a Material Adverse Effect.

MKING000433

**Exhibit 1 - Page 5 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**4.15     Environmental Conditions**

**4.15.1     Definitions.** As used in this Agreement,

(a)     *Environmental Law* means any federal, state, or local statute, ordinance, or regulation pertaining to the protection of human health or the environment and any applicable orders, judgments, decrees, permits, licenses, or other authorizations or mandates under such statutes, ordinances, or regulations; and

(b)     *Hazardous Substance* means any hazardous, toxic, radioactive, or infectious substance, material, or waste as defined, listed, or regulated under any Environmental Law, and includes without limitation petroleum oil and its fractions.

**4.15.2 Compliance.** Seller's business and the Assets are in compliance with all Environmental Laws and Seller has all permits required under Environmental Laws in connection with the construction, ownership, or operation of the Assets and Seller's business. Seller is not aware of and has not received notice of any past, present, or anticipated future events, conditions, activities, investigation, studies, plans, or proposals that (a) would interfere with or prevent compliance by Seller's business or the Assets with any Environmental Law, or (b) may give rise to any common-law or other liability, or otherwise form the basis of a claim, action, suit, proceeding, hearing, or investigation, involving Seller's business or the Assets and related in any way to Hazardous Substances or Environmental Laws.

**4.15.3 Hazardous Substances.** No Hazardous Substance has been disposed of, spilled, leaked, or otherwise released on, in, under, or from, or otherwise come to be located in the soil or water (including surface and ground water) on or under, the Real Property or any other real property owned, leased, or occupied by Seller in connection with Seller's business now or in the past.

**4.15.4 Environmental Records.** Seller has disclosed and made available to Buyer true, complete, and correct copies or results of any reports, studies, analysis, tests, monitoring, correspondence with governmental agencies, or other documents in the possession of or initiated by Seller or otherwise known to Seller and pertaining to the existence of Hazardous Substances, to compliance with Environmental Laws, or to any other environmental concern relating to the Assets or Seller's business.

**4.16     Accuracy of Representations and Warranties.** None of the representations or warranties of Seller or Selling Member contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make statements in this Agreement not misleading. Seller and Selling Member know of no fact that has resulted, or that in the reasonable judgment of Selling Member will result, in a material change in the business, operations, or assets of Seller that has not been set forth in this Agreement or otherwise disclosed to Buyer.

Page 6 of 17

## SECTION 5. REPRESENTATIONS OF BUYER

Buyer represents and warrant as follows:

**5.1   Corporate Existence.** Buyer will be a corporation duly organized and validly existing under the laws of the state of Oregon. Buyer will have all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

**5.2   Authorization.** The execution, delivery, and performance of this Agreement have been duly authorized and approved by the board of directors and members of Buyer, and this Agreement constitutes a valid and binding agreement of Buyer, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws affecting the enforcement of creditors' rights or by the application of general principles of equity.

**5.3   Accuracy of Representations and Warranties.** None of the representations or warranties of Buyer or Guarantors contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make the statements contained herein not misleading.

## SECTION 6. COVENANTS OF SELLER AND SELLING MEMBER

**6.1   Seller's Operation of Business Prior to Closing.** Seller and Selling Member agree that between the date of this Agreement and the closing date, Seller will:

**6.1.1**  Continue to operate the business that is the subject of this Agreement in the usual and ordinary course and in substantial conformity with all applicable laws, ordinances, regulations, rules, or orders, and will use its best efforts to preserve its business organization and preserve the continued operation of its business with its customers, suppliers, and others having business relations with Seller.

**6.1.2**  Not assign, sell, lease, or otherwise transfer or dispose of any of the assets used in the performance of its business, whether now owned or hereafter acquired, except in the normal and ordinary course of business and in connection with its normal operation.

**6.1.3**  Maintain all its assets other than inventories in their present condition, reasonable wear and tear and ordinary usage excepted, and maintain the inventories at levels normally maintained.

**6.2   Access to Premises and Information.** At reasonable times before the closing date, Seller will provide Buyer and its representatives with reasonable access during business hours to the assets, titles, contracts, and records of Seller and furnish such additional information concerning Seller's business as Buyer from time to time may reasonably request.

MKING000435

**Exhibit 1 - Page 7 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**6.2.1 Sell Access to all records and documents.** Seller shall have unlimited access to all documents and records, including, but not limited to invoices, payment records, bank documents, Quickbook files, documents from each and any agency assignment for the full period of the contract and until all new business is closed out to the Seller's satisfaction.

**6.3 Change of Name.** On or before the closing date, Seller will take all action necessary or appropriate to permit Buyer to legally commence use of Seller's name on the closing date.

**6.4 Conditions and Best Efforts.** Seller and Selling Member will use their best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of the obligations of Seller and Selling Member under this Agreement, and will do all acts and things as may be required to carry out their respective obligations under this Agreement and to consummate and complete this Agreement.

## SECTION 7. COVENANTS OF BUYER

**7.1 Conditions and Best Efforts.** Buyer will use its best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of Buyer's obligations under this Agreement, and shall do all acts and things as may be required to carry out Buyer's obligations and to consummate this Agreement.

**7.2 Confidential Information.** If for any reason the sale of Assets is not closed, Buyer will not disclose to third parties any confidential information received from Seller or Selling Member in the course of investigating, negotiating, and performing the transactions contemplated by this Agreement.

## SECTION 8. CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

The obligation of Buyer to purchase the Assets is subject to the fulfillment, before or at the closing date, of each of the following conditions, any one or portion of which may be waived in writing by Buyer:

**8.1 Representations, Warranties, and Covenants of Seller and Selling Member.** All representations and warranties made in this Agreement by Seller and Selling Member shall be true as of the closing date as fully as though such representations and warranties had been made on and as of the closing date, and, as of the closing date, neither Seller nor Selling Member shall have violated or shall have failed to perform in accordance with any covenant contained in this Agreement.

**8.2 Licenses and Permits.** Buyer shall have obtained all licenses and permits from public authorities necessary to authorize the ownership and operation of the business of Seller.

**8.3 Conditions of the Business.** There shall have been no material adverse change in the manner of operation of Seller's business before the closing date.

MKING000436

**Exhibit 1 - Page 8 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**8.4    No Suits or Actions.** At the closing date no suit, action, or other proceeding shall have been threatened or instituted to restrain, enjoin, or otherwise prevent the consummation of this Agreement or the contemplated transactions.

## SECTION 9.  CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER AND SELLING MEMBER

The obligations of Seller and Selling Member to consummate the transactions contemplated by this Agreement are subject to the fulfillment, before or at the closing date, of each of the following conditions, any one or a portion of which may be waived in writing by Seller:

**9.1    Representation, Warranties, and Covenants of Buyer.** All representations and warranties made in this Agreement by Buyer shall be true as of the closing date as fully as though such representations and warranties had been made on and as of the closing date, and Buyer shall not have violated or shall not have failed to perform in accordance with any covenant contained in this Agreement.

## SECTION 10.  INDEMNIFICATION AND SURVIVAL

**10.1    Survival of Representations and Warranties.** All representations and warranties made in this Agreement shall survive the closing of this Agreement, except that any party to whom a representation or warranty has been made in this Agreement shall be deemed to have waived any misrepresentation or breach of representation or warranty of which such party had knowledge before closing. Any party learning of a misrepresentation or breach of representation or warranty under this Agreement shall immediately give written notice thereof to all other parties to this Agreement. The representations and warranties in this Agreement shall terminate three years from the closing date, and such representations or warranties shall thereafter be without force or effect, except any claim with respect to which notice has been given to the party to be charged prior to such expiration date.

### 10.2    Seller's and Selling Member's Indemnification

**10.2.1** Seller and Selling Member each hereby agree to indemnify and hold Buyer, its successors, and assigns harmless from and against:

(1)    Any and all claims, liabilities, and obligations of every kind and description, contingent or otherwise, arising out of or related to the operation of Seller's business prior to the close of business on the day before the closing date, except for claims, liabilities, and obligations of Seller expressly assumed by Buyer under this Agreement or paid by insurance

Page 9 of 17

MKING000437

**Exhibit 1 - Page 9 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

maintained by Seller, Selling Member, or Buyer.

(2)     Any and all damage or deficiency resulting from any material misrepresentation, breach of warranty or covenant, or nonfulfillment of any agreement on the part of Seller and Selling Member under this Agreement.

**10.3    Buyer's Indemnification.** Buyer agrees to defend, indemnify, and hold harmless Seller and Selling Member from and against:

**10.3.1** Any and all claims, liabilities, and obligations of every kind and description arising out of or related to the operation of the business following closing or arising out of Buyer's failure to perform obligations of Seller assumed by Buyer pursuant to this Agreement.

**10.3.2** Any and all damage or deficiency resulting from any material misrepresentation, breach of warranty or covenant, or nonfulfillment of any agreement on the part of Buyer under this Agreement.

## SECTION 11. CLOSING

**11.1    Obligations of Seller and Selling Member at the Closing.** At the closing, Seller and Selling Member shall deliver to Buyer the following:

**11.2.1** Bills of sale, assignments, properly endorsed certificates of title, and other instruments of transfer, in form and substance reasonably satisfactory to counsel for Buyer, necessary to transfer and convey all of the Assets to Buyer.

**11.2.2** The consulting agreement described in Section 3.1.

**11.2.3** Such other certificates and documents as may be called for by the provisions of this Agreement.

**11.3    Obligations of Buyer at the Closing.** At the closing, Buyer shall deliver to Seller the following:

**11.3.1** A check in the amount specified in Section 2.

**11.3.2** Such other certificates and documents as may be called for by the provisions of this Agreement.

**11.4    Enaction of this contract will occur on January 1st 2010 at 0001 hours Portland Local Time (the Transfer Date).** All Agencies or employment being assigned before this date will be the property of the Seller; All Agencies or employment being assigned on or after this date will be the property of the Buyer.

MKING000438

**Exhibit 1 - Page 10 of 16**
Case 13-03249-tmb    Doc 30    Filed 04/08/14

## SECTION 12. RIGHTS AND OBLIGATIONS SUBSEQUENT TO CLOSING

**12.1 Books and Records.** This sale does not include the books of account and records of Seller's business. However, possession and custody of such books and records, except for Seller's general ledger, may be retained by Buyer at the place of business Buyer is acquiring from Seller under this Agreement for a period of 12 months. During this period, Seller or its agents shall have access to such books and records and may make copies thereof. Buyer will exercise reasonable care in the safekeeping of such records. Seller shall retain its general ledger but shall make it available for inspection by Buyer from time to time upon reasonable request.

## SECTION 13. TERMINATION OF AGREEMENT

**13.1 By Mutual Consent.** This Agreement may be terminated by mutual written consent of Buyer and Seller.

**13.2 Breach of Representations and Warranties; Failure of Conditions.** Buyer may elect by notice to Seller, and Seller may elect by notice to Buyer, to terminate this Agreement if:

**13.2.1** The terminating party shall have discovered a material error, misstatement, or omission in the representations and warranties made in this Agreement by the other party which shall not have been cured by such other party within 7 days after written notice to such other party specifying in detail such asserted error, misstatement, or omission, or by the closing date, whichever first occurs.

**13.2.2** All of the conditions precedent of the terminating party's obligations under this Agreement have not occurred and have not been waived by the terminating party on or prior to the closing date.

## SECTION 14. MISCELLANEOUS

**14.1 Binding Effect.** This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, personal representatives, successors, and permitted assigns.

**14.2 Assignment.** Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any party without the prior written consent of the other parties.

**14.3 No Third-Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended or shall be construed to confer on any person, other than the parties to this Agreement, any right, remedy, or claim under or with respect to this Agreement.

**14.4 Amendments.** This Agreement may be amended only by an instrument in writing executed by all the parties, which writing must refer to this Agreement.

MKING000439

**Exhibit 1 - Page 11 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**14.5. Further Assurances.** Each party agrees (a) to execute and deliver such other documents and (b) to do and perform such other acts and things, as any other party may reasonably request, in order to carry out the intent and accomplish the purposes of this Agreement.

**14.6 Time of Essence.** Time is of the essence with respect to all dates and time periods set forth or referred to in this Agreement.

**14.7 Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear the party's own expenses in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated by this Agreement.

**14.8. Waiver.** Any provision or condition of this Agreement may be waived at any time, in writing, by the party entitled to the benefit of such provision or condition. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

**14.9 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon, without regard to conflict-of-laws principles.

**14.10 Attorney Fees.** Parties agree to be bound to mutually binding arbitration and are responsible for their own attorney fees, if any.

**14.11 Injunctive and Other Equitable Relief.** The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that the other parties shall be entitled, in addition to damages, to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

**14.12 Venue.** Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties through mutually binding arbitration.

**14.13 Exhibits.** The exhibits referenced in this Agreement are a part of this Agreement as if fully set forth in this Agreement.

**14.14 Severability.** If any provision of this Agreement shall be invalid or unenforceable in any respect for any reason, the validity and enforceability of any such provision in any other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

MKING000440

Exhibit 1 - Page 12 of 16

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**14.15. Entire Agreement.** This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

**Consultant**

_____     $\underline{5/10/09}$
Andreas Papachristpoulos                           Date

**Company**

_____     $\underline{3\ /10\ /09}$
Matt King, President                                      Date

_____     $\underline{5/10/09}$
Steve King                                                      Date

Page 13 of 17

MKING000441

**Exhibit 1 - Page 13 of 16**

Case 13-03249-tmb    Doc 30    Filed 04/08/14

EXHIBIT B

## CONSULTING AGREEMENT

PARTIES:    Matthew King and Stephen King            ("Company")
an impending Oregon corporation

              Andreas Papachristpoulos             ("Consultant")

The parties agree as follows:

**1.    Term.** This Agreement shall continue through January 1st 2015, 5 years from The Transfer Date, unless terminated earlier in accordance with Section 9 below.

**2.    Status of Consultant.** Consultant shall be responsible for providing his own insurance, if any, including medical, dental, workers' compensation, and life insurance. Consultant agrees that Company shall have no responsibility or liability to him for any such benefits. Company shall not withhold any taxes from fees paid to Consultant. Consultant shall pay all income, Social Security, and other taxes, including estimated taxes, which Consultant owes based on fees paid to Consultant under this Agreement.

**3.    Consulting Services.** During the term of this Agreement, Consultant shall provide services to Company on the following terms:

(a)    Consultant will work to increase volume of business by traveling to foreign ports, working existing contacts, and following up on new leads and opportunities. Company anticipates that Consultant will make 2-3 international travels a year to maintain desired growth.

(b)    Consultant will transition Company to a point where Company is self sufficient with the day to day business workings, and is accepted by the community that makes up this industry, well regarded by that community, and established such that Company's competition does not have an easy opportunity to dispose of Company.

(c)    Consultant's services shall be provided on dates and at times reasonably convenient to both parties.

**4.    Consulting Fees; Expenses.** During the term of this Agreement, Consultant shall provide services to Company on the following terms:

(a)    Existing Business - Consultant will be paid a percentage of The Agency Fees for each of the five years of the contract, with year 1 at 50%, year 2 at 40%, year 3 at 30% and years 4 and 5 at 20%, with no one year to exceed $48,000.00 in payments to Consultant.

(b)    Existing business shall be defined as any client or customer that Consultant has

Page 14 of 17

listed on the Principals List, Exhibit A. Consultant will be paid this amount per ship agency that Company receives for this period.

(c) For new business, which is to say companies or owners not listed on the Principals List, Exhibit A, Consultant will receive 25% of all revenues for a ship from that company or owner for a period of three years. As an example: Consultant finds a new customer and brings in 20 ships per year. Company is not listed on the Principals List, Exhibit A. Consultant shall receive 25% of the Agency Fee for every ship that assigns agency to Company.

(c) Consultant will be paid monthly as agencies are closed out.

Additionally, Consultant shall be reimbursed for reasonable travel expenses approved in advance by Company, to include transportation, accommodations, business meals and entertainment, and other business related expenses.

5. **Confidential Information.** Consultant shall not, without prior written authorization from Company, disclose to anyone outside Company or use in other than Company's business any information or material, whether acquired by him during or after his employment with Company or acquired in the course of providing services under this Agreement, considered by Company to be confidential or proprietary, including without limitation, that regarding: (a) matters of a technical nature such as know-how, formulas, trade secrets, secret processes, inventions, and research projects; (b) matters of a business nature such as information about expenses, costs, pricing policies, profits, markets, sales, suppliers, customers, plans for future development or products, and reorganization or corporate strategies; and (c) any other information or materials not generally disclosed by Company outside Company. Consultant shall inform all persons having access to confidential information of the confidential nature thereof and of Consultant's obligations hereunder, and shall take reasonable security precautions and such other actions as may be necessary to insure that there is no use or disclosure of confidential information in violation of this Agreement.

6. **Cooperation.** Consultant will cooperate with Company in executing any documents or taking other action reasonably requested by Company to perfect or protect its intellectual property ownership rights, with any expenses of such cooperation to be paid by Company.

7. **Indemnity.** Consultant agrees to defend, indemnify, and hold Company, its officers, directors, employees, and agents harmless from any claims or damages, including attorney fees, arising out of acts or omissions of Consultant in connection with work performed pursuant to this Agreement.

8. **Return of Materials.** On conclusion of any particular work, or as requested by Company, Consultant will return to Company all materials or documents produced or provided in connection with the work.

Page 15 of 17

## 9.  Termination

**9.1**  This Agreement shall terminate automatically on the death or permanent disability of Consultant. Permanent disability shall exist when Consultant suffers from a condition of mind or body that, in the judgment of Company, prevents him from further performance of duties under this Agreement.

**9.2**  This Agreement may be terminated by Company for any of the following reasons:

(a)  Death or disability of Consultant.

(b)  Disloyalty to Company or unauthorized disclosure of confidential information by Consultant.

(c)  Failure by Consultant to perform his duties with diligence and competence.

## SECTION 10.  NONCOMPETITION

### 10.1  Covenants of Noncompetition and Nonsolicitation

**10.1.1  Covenants.** Consultant covenants and agrees that for the Restriction Period (defined in Section 10.1.4), Consultant shall not, directly or indirectly:

(1)  Engage, within West Coast/Pacific Rim, in the business of shipping port representation or in any other business that competes with a business conducted by the Company on the date that Employee's employment with the Company terminates for any reason.  In the event that Consultant engages in such business, 60% of Gross Revenue will be due as compensation to The Company.

(2)  For the benefit of Consultant or any other person or enterprise, (a) solicit any business whatsoever from any customer of the Company, (b) induce or cause any customer to cease purchasing any service or product from the Company or to terminate or change such customer's business relationship with the Company in any manner, or (c) induce or cause any supplier to cease providing or selling any service or product to the Company or to terminate or change such supplier's business relationship with the Company in any manner.

**10.1.2  Indirect Activities.** Consultant shall be deemed to be indirectly engaged in a business covered by Section 10.1.1(1) if Consultant (1) owns an interest in or participates in the management, operation, or control of any enterprise that is engaged in a business covered by Section 10.1.1(1) or (2) performs shipping port representation for any enterprise that is engaged in a business covered by Section 10.1.1(1). For purposes of this Agreement, the term *enterprise* includes a sole proprietorship, partnership, limited liability company, corporation, trust, association, or other form of entity or association.

**10.1.3  Reasonableness of Restrictions.** Consultant acknowledges that the

MKING000444

Exhibit 1 - Page 16 of 16

Case 13-03249-tmb    Doc 30    Filed 04/08/14

# AGREEMENT FOR SALE AND PURCHASE
## OF BUSINESS ASSETS

**DATE:**        **January 1, 2010**

**PARTIES:**      **Orion Ship Agency, LLC,**            ("Seller")
an Oregon limited liability company

                      **Andreas Papachristopoulos**    ("Selling Member")
                      13690 SW Tamaway Lane
                      Tigard, OR 97223

                      **Matthew King and Stephen King**    ("Buyer")
                      Orion Agency LLC
                      817 Sherman St
                      Hood River Or 97031

## RECITALS:

    **A.**      Seller operates a business primarily engaged in shipping port representation. Seller owns contract rights and miscellaneous assets used in connection with the operation of its business.

    **B.**      Buyer desires to acquire substantially all the assets used or useful, or intended to be used, in the operation of Seller's business, and Seller desires to sell such assets to Buyer.

    **C.**      Selling Member is the sole member of Seller.

## AGREEMENT:

## SECTION 1.  ASSETS PURCHASED; LIABILITIES ASSUMED

**Assets Purchased.** Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, on the terms and conditions set forth in this Agreement, the following assets ("Assets"):

    **1.1.1** All of Seller's rights under contracts to which Seller is a party effective as of January 1, 2010.

    **1.1.2** Seller's name and goodwill.

    **1.1.3** All other proprietary rights and intangible property of Seller, including customer lists, customer relationships, customer agreements, customer understandings, and operating rights and all other such items listed on the Principals List, Exhibit A and all such items acquired by Seller or coming into existence on or before the Closing Date;

Page 1 of 11

**1.1.4** To the extent transferable, all approvals, authorizations, consents, licenses, permits, franchises, tariffs, orders, and other registrations of any federal, state, or local court or other governmental department, commission, board, bureau, agency, or instrumentality held by Seller and required or appropriate for the conduct of the business of Seller, and all such items granted or received on or before the Closing Date;

**1.1.5** All accounts receivable and other receivables of Seller received on or after January 1st 2010 for Operations originating on or after January 1st 2010.

**1.1.6** All assignable rights, if any, to all telephone lines and numbers, domain names, logos, identity and brand recognition designs, and email addresses used in the conduct of the business of Seller.

**1.2    Liabilities Assumed.** Buyer shall accept the assignment and assume responsibility for all contracts with customers of Seller for vessels arriving on or after January 1st 2010. All obligations and liabilities of Seller not described in this Section 1.2 shall remain and be the obligations and liabilities solely of Seller and shall not be assumed by Buyer.

## SECTION 2.  PURCHASE PRICE FOR ASSETS

The purchase price for the Assets shall be $5000.00 USD.

## SECTION 3.  OTHER AGREEMENTS

At closing, the parties shall execute the following additional agreements:

**3.1**    The consulting agreement between Buyer and Selling Member, attached as Exhibit B.

## SECTION 4.  SELLER'S AND SELLING MEMBER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to the Buyer as follows:

**4.1    Corporate Existence.** Seller is now and on the closing date will be a corporation duly organized and validly existing under the laws of the state of Oregon. Seller has all requisite corporate power and authority to own, operate, or lease the Assets, as the case may be, and to carry on its business as now being conducted.

**4.2    Authorization.** The execution, delivery, and performance of this Agreement have been duly authorized and approved by Seller, and this Agreement constitutes a valid and binding agreement of Seller, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws affecting the enforcement of creditors' rights or by the application of general principles of equity.

Exhibit 2 - Page 2 of 8
Case 13-03249-tmb    Doc 30    Filed 04/08/14

**4.3    Financial Statements.** Seller has delivered to Buyer income tax returns for Seller's fiscal years ended 2007, and will deliver to Buyer income tax returns for all additional interim periods ending before the January 1st 2010.

**4.4    Litigation.** Seller and Selling Member have no knowledge of any claim, litigation, proceeding, or investigation pending or threatened against Seller that might result in any Material Adverse Change in the business or condition of the Assets being conveyed under this Agreement.

**4.5    Compliance with Laws.** To the best of its knowledge, Seller has at all relevant times conducted its business in compliance with the its articles of organization, its operating agreement, and all applicable laws and regulations. To the best of Seller's knowledge, Seller is not in violation of any applicable laws or regulations, other than violations that singly or in the aggregate do not, and, with the passage of time will not, have a Material Adverse Effect. Seller is not subject to any outstanding order, writ, injunction, or decree, and Seller has not been charged with, or threatened with a charge of, a violation of any provision of federal, state, or local law or regulation.

**4.6    Tangible Assets**

**4.6.1    Real Property.** Seller does not have any ownership interest in any real property.

**4.6.2    Personal Property.** Assets include all of the assets, properties, and rights Owned or used by Seller in the Business or necessary to maintain and operate the Business.

**4.6.3    Intellectual Property.** Seller owns all its Intellectual Property free and clear of all liens, claims, and encumbrances. Seller's use of its Intellectual Property does not create any conflict with or infringe upon any rights of any other person and no claims of conflict or infringement have been asserted against Seller.

**4.7    Leases.** Seller is not a party to any real property lease.

**4.8    Title and Condition of Tangible Assets**

**4.8.1** Seller has good and absolute title to the Tangible Personal Property.

**4.9    Absence of Certain Changes or Events.** Since May 10, 2009, there has not been:

**4.9.1** Any Material Adverse Change or any event, occurrence, development, or state of circumstances or facts that could reasonably be expected to result in a Material Adverse Change;

**4.9.2** Any conduct of business that is outside the ordinary course of business or not substantially in the manner that Seller previously conducted its business;

**4.9.3** Any incurrence of any noncontract liability known to Seller which, either singly or in the aggregate, is material to the business, results of operations, financial condition, or prospects of Seller;

**4.9.4** Any change in the assets, liabilities, licenses, permits, or franchises of Seller, or in any agreement to which Seller is a party or is bound, which has had or reasonably could be expected to have a Material Adverse Effect.

**4.10 Accuracy of Representations and Warranties.** None of the representations or warranties of Seller or Selling Member contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make statements in this Agreement not misleading. Seller and Selling Member know of no fact that has resulted, or that in the reasonable judgment of Selling Member will result, in a material change in the business, operations, or assets of Seller that has not been set forth in this Agreement or otherwise disclosed to Buyer.

## SECTION 5.    REPRESENTATIONS OF BUYER

Buyer represents and warrant as follows:

**5.1    Corporate Existence.** Buyer will be a corporation duly organized and validly existing under the laws of the state of Oregon. Buyer will have all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

**5.2    Authorization.** The execution, delivery, and performance of this Agreement have been duly authorized and approved by the board of directors and members of Buyer, and this Agreement constitutes a valid and binding agreement of Buyer, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws affecting the enforcement of creditors' rights or by the application of general principles of equity.

**5.3    Accuracy of Representations and Warranties.** None of the representations or warranties of Buyer or Guarantors contain or will contain any untrue statement of a material fact or omit or will omit or misstate a material fact necessary in order to make the statements contained herein not misleading.

## SECTION 6.    COVENANTS OF SELLER AND SELLING MEMBER

**6.1    Seller Access to all records and documents.** Seller shall have unlimited access to all documents and records, including, but not limited to invoices, payment records, bank documents, Quickbook files, documents from each and any agency assignment for the full period of the contract and until all new business is closed out to the Seller's satisfaction.

**6.2    Conditions and Best Efforts.** Seller and Selling Member will use their best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of the obligations of Seller and Selling Member under this Agreement, and will do all acts and things as may be required to carry out their respective obligations under this Agreement and to consummate and complete this Agreement.

# SECTION 7. COVENANTS OF BUYER

**7.1    Conditions and Best Efforts.** Buyer will use its best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of Buyer's obligations under this Agreement, and shall do all acts and things as may be required to carry out Buyer's obligations and to consummate this Agreement.

**7.2    Confidential Information.** If for any reason the sale of Assets is not fully performed, Buyer will not disclose to third parties any confidential information including information on the Principals List received from Seller or Selling Member in the course of investigating, negotiating, and performing the transactions contemplated by this Agreement.

# SECTION 8. SURVIVAL

**8.1    Survival of Representations and Warranties.** All representations and warranties made in this Agreement shall continue after January 1st 2010 , except that any party to whom a representation or warranty has been made in this Agreement shall be deemed to have waived any misrepresentation or breach of representation or warranty of which such party had knowledge before January 1st 2010. Any party learning of a misrepresentation or breach of representation or warranty under this Agreement shall immediately give written notice thereof to all other parties to this Agreement. The representations and warranties in this Agreement shall terminate three years from January 1st 2010, and such representations or warranties shall thereafter be without force or effect, except any claim with respect to which notice has been given to the party to be charged prior to such expiration date.

# SECTION 9. CLOSING

**9.1    Obligations of the Seller.** On January 1st 2010, Buyer and Seller shall deliver and perform the following:

**9.2.1** Bills of sale, assignments, properly endorsed certificates of title, and other Instruments of transfer, in form and substance reasonably satisfactory to counsel for Buyer, necessary to transfer and convey all of the Assets to Buyer.

**9.2.2**    The consulting agreement described in Section 3.1.

**9.2.3** Such other certificates and documents as may be called for by the provisions of this Agreement.

**9.3    Obligations of Buyer at the Closing.** On January 1st 2010, Buyer shall deliver to Seller the following:

**9.3.1** A check in the amount specified in Section 2.

**9.3.2**    Such other certificates and documents as may be called for by the provisions of this Agreement.

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**9.4     Enaction of this contract will occur on January 1st 2010 at 0001 hours Portland Local Time (the Transfer Date).** All Agencies or employment being assigned before this date will be the property of the Seller; All Agencies or employment being assigned on or after this date will be the property of the Buyer.

## SECTION 10.   RIGHTS AND OBLIGATIONS SUBSEQUENT TO  JANUARY 1st 2010

**10.1   Books and Records.** This sale does not include the books of account and records of Seller's business. However, possession and custody of such books and records, except for Seller's general ledger, may be retained by Buyer at the Buyer's place of business for a period of 12 months. During this period, Seller or its agents shall have access to such books and records and may make copies thereof. Buyer will exercise reasonable care in the safekeeping of such records. Seller shall retain its general ledger but shall make it available for inspection by Buyer from time to time upon reasonable request. Buyer will deliver all such books and records to Seller on or before January 1st 2011.

## SECTION 11.   TERMINATION OF AGREEMENT

**11.1   By Mutual Consent.** This Agreement may be terminated by mutual written consent of Buyer and Seller.

**11.2   Breach of Representations and Warranties; Failure of Conditions.** Buyer may elect by notice to Seller, and Seller may elect by notice to Buyer, to terminate this Agreement if:

**11.2.1** The terminating party shall have discovered a material error, misstatement, or omission in the representations and warranties made in this Agreement by the other party which shall not have been cured by such other party within 7 days after written notice to such other party specifying in detail such asserted error, misstatement, or omission, or by January 1st 2010, whichever first occurs.

**11.2.2** All of the conditions precedent of the terminating party's obligations under this Agreement have not occurred and have not been waived by the terminating party on or prior to January 1st 2010.

## SECTION 12.   MISCELLANEOUS

**12.1   Binding Effect.** This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, personal representatives, successors, and permitted assigns.

**12.2   Assignment.** Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld.

**12.3   No Third-Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended or shall be construed to confer on any person, other than the parties to this Agreement, any right, remedy, or claim under or with respect to this Agreement.

**12.4 Amendments.** This Agreement may be amended only by an instrument in writing executed by all the parties, which writing must refer to this Agreement.

**12.5. Further Assurances.** Each party agrees (a) to execute and deliver such other documents and (b) to do and perform such other acts and things, as any other party may reasonably request, in order to carry out the intent and accomplish the purposes of this Agreement.

**12.6 Time of Essence.** Time is of the essence with respect to all dates and time periods set forth or referred to in this Agreement.

**12.7 Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear the party's own expenses in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated by this Agreement.

**12.8. Waiver.** Any provision or condition of this Agreement may be waived at any time, in writing, by the party entitled to the benefit of such provision or condition. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

**12.9 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon, without regard to conflict-of-laws principles.

**12.10 Arbitration, Attorney Fees.** The parties agree to be bound to mutually binding arbitration for any dispute arising from this Agreement, and are responsible for their own attorney fees, if any.

**12.11 Injunctive and Other Equitable Relief.** The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that the other parties shall be entitled, in addition to damages, to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

**12.12 Venue.** Any action or proceeding seeking to enforce any provision of, or the interpretation of any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties through mutually binding arbitration in Portland, Oregon, before one arbitrator to be mutually agreed upon, or if the parties are unable to agree, by a single arbitrator appointed by the Multnomah County Circuit Court pursuant to ORS 36.474.

**12.13 Exhibits.** The exhibits referenced in this Agreement are a part of this Agreement as if fully set forth in this Agreement.

Case 13-03249-tmb    Doc 30    Filed 04/08/14

**12.14 Severability.** If any provision of this Agreement shall be invalid or unenforceable in any respect for any reason, the validity and enforceability of any such provision in any other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

**12.15. Entire Agreement.** This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

~~Consultant~~ Seller

_____          ___2/10/11___
**Andreas Papachristpoulos**                  **Date**

**Company**

_____          ___2 /10 /11___
**Matt King, President**                      **Date**

_____          ___2/10/11___
**Steve King**                                **Date**

## EXHIBIT B

## CONSULTING AGREEMENT

**PARTIES:**   **Matthew King and Stephen King**      ("Company")
As Orion Agency, an Oregon corporation

**Andreas Papachristopoulos**      ("Consultant")

The parties agree as follows:

1.   **Term.** This Agreement shall continue through January 1st 2015, 5 years from The Transfer Date.

2.   **Status of Consultant.** Consultant shall be responsible for providing his own insurance, if any, including medical, dental, workers' compensation, and life insurance. Consultant agrees that Company shall have no responsibility or liability to him for any such benefits. Company shall not withhold any taxes from fees paid to Consultant. Consultant shall pay all income, Social Security, and other taxes, including estimated taxes, which Consultant owes based on fees paid to Consultant under this Agreement.

3.   **Consulting Services.** During the term of this Agreement, Consultant shall provide services to Company on the following terms:

(a)      Consultant will work to increase volume of business by traveling to foreign ports, working existing contacts, and following up on new leads and opportunities. Company anticipates that Consultant will make 2-3 international trips a year to maintain desired growth, at the Company's expense, pursuant to Paragraph 4.

(b)      Consultant will transition Company to a point where Company is self sufficient with the day to day business workings, and is accepted by the community that makes up this industry, well regarded by that community, and established such that Company's competition does not have an easy opportunity to dispose of Company.

(c)      Consultant's services shall be provided on dates and at times reasonably convenient to both parties.

4.   **Consulting Fees; Expenses.** Consultant will be paid for services to the Company under this Agreement on the following terms:

**4.1**      Consultant Compensation will be calculated by the process defined in Addendum A "Orion Financial Process". Consultant will be paid 50% of Addendum A Profits in years 2010, 2011, and 2012. Consultant will be paid 40% of Addendum A Profits for years 2013 and 2014.

**4.2**      In the event that the Company is required to employ additional personnel, the overhead percentage of 27% as per Addendum A may be changed to reflect the additional labor cost and revenues.

**4.3**    After the term of this 5 year contract, Consultant will receive as sales commission 50% of Addendum A Profits for new business for 3 years from the date of that new business' first vessel 's arrival at the Pilot Station. This includes new business created during the 5 year term of this contract whose 3 year commission compensation extends beyond the 5 year term of this agreement.

**5.**    **Confidential Information.** Consultant shall not, without prior written authorization from Company, disclose to anyone outside Company or use in other than Company's business any information or material, whether acquired by him during or after his employment with Company or acquired in the course of providing services under this Agreement, considered by Company to be confidential or proprietary, including without limitation, that regarding: (a) matters of a technical nature such as know-how, formulas, trade secrets, secret processes, inventions, and research projects; (b) matters of a business nature such as information about expenses, costs, pricing policies, profits, markets, sales, suppliers, customers, plans for future development or products, and reorganization or corporate strategies; and (c) any other information or materials not generally disclosed by Company outside Company. Consultant shall inform all persons having access to confidential information of the confidential nature thereof and of Consultant's obligations hereunder, and shall take reasonable security precautions and such other actions as may be necessary to insure that there is no use or disclosure of confidential information in violation of this Agreement.

**6.**    **Cooperation.** Consultant will cooperate with Company in executing any documents or taking other action reasonably requested by Company to perfect or protect its intellectual property ownership rights, with any expenses of such cooperation to be paid by Company.

**7.**    **Return of Materials.** On conclusion of any particular work, or as requested by Company, Consultant will return to Company all materials or documents produced or provided in connection with the work.

## SECTION 10. NONCOMPETITION

**10.1**    Covenants of Noncompetition and Nonsolicitation

**10.1.1    Covenants.** Consultant covenants and agrees that for the Restriction Period (defined in Section 10.1.4), Consultant shall not, directly or indirectly:

(1)    Engage, within West Coast/Pacific Rim (countries bordering the North or South Pacific Oceans), in the business of shipping port representation or in any other business that competes with a business conducted by the Company on the date that Employee's employment with the Company terminates for any reason. In the event that Consultant engages in such business, 60% of Gross Profit will be due as compensation to The Company.

(2)    For the benefit of Consultant or any other person or enterprise, (a) solicit any business whatsoever from any customer of the Company, (b) induce or cause any customer to cease purchasing any service or product from the Company or to terminate or change such customer's business relationship with the Company in any manner, or (c) induce or cause any supplier to cease providing or selling any service or product to the Company or to terminate or change such supplier's business relationship with the Company in any manner.

**10.1.2  Indirect Activities.**  Consultant shall be deemed to be indirectly engaged in a business covered by Section 10.1.1(1) if Consultant (1) owns an interest in or participates in the management, operation, or control of any enterprise that is engaged in a business covered by Section 10.1.1(1)  which performs shipping port representation for any enterprise that is engaged in a business covered by Section 10.1.1(1). For purposes of this Agreement, the term *enterprise* includes a sole proprietorship, partnership, Limited Liability Company, corporation, trust, association, or other form of entity or association.

**10.1.3  Reasonableness of Restrictions.** Consultant acknowledges that the covenants set forth in this Section 10.1 do not impose unreasonable restrictions or work a hardship on Consultant, are essential to the willingness of the Company to employ Consultant, are necessary and fundamental to the protection of the business conducted by the Company, and are reasonable as to scope, duration, and territory.

**10.1.4  Restriction Period.** The covenants set forth in this Section 10.1 shall be binding on Consultant for the period (the "Restriction Period") commencing on the date of this Agreement and ending 2 years after the date of the end of this contract.


**Consultant**


_____          2/10/11
**Andreas Papachristpoulos**              **Date**


**Company**


_____          2 / 10 /11
**Matt King, President**                  **Date**


_____          2/10/11
**Steve King**                            **Date**


page

# ADDENDUM A
# ORION FINANCIAL PROCESS

| REVENUE | GROSS JOB PROFIT (cash basis) | MINUS | EXPENSES | MINUS | Overhead Cap | EQUALS | ADDENDUM A PROFITS |
|---|---|---|---|---|---|---|---|
| Pass Through Items | Base Agency Fee | | | | Mileage paid to driver | | TO BE DISTRIBUTED To CONSULTANT |
| (Not Considered in contractual equation) | Additional Days | | | | Advertising and Marketing | | |
| | Items from Schedule of FEES | | | | Computer and Internet | | 50% Years 2010, 11, 12 |
| | MILEAGE AT $.65/MILE | | Rebates (Pilnico or other) | | Travel and Entertainments | | 40% Years 2013, 14 |
| Tugs | FedEx or other Express Mail | | | | Finance Charges | | |
| Pilots | Wire Transfer Fees | | | | Membership Dues | | |
| dockage | Telex/Fax Expenses | | | | Office Supplies | | |
| etc. | Commisions (Bruce, GSB, Shaver, Other) | | | | Overhead Mailing | | |
| | Phillippines Crew Visa | | | | Overhead Telephone | | |
| | | | | | Professional Fees | | |
| | | | | | Taxes | | |
| | | | | | SET AT CAP RATE 27% | | |



# Item Detail

Check 1 of 15      Status: Paid ✔

| tranDate | account | amount | serial | tranCode | aba | sequence |
|---|---|---|---|---|---|---|
| 04/25/2011 | ▮▮▮1841 | $15,000.00 | 000000001383 | 000000 | 323070380 | 13000536 |

Add to Multi-Item

**ORION AGENCY LLC**
3439 NE SANDY BLVD, SUITE 292
PORTLAND, OR 97232

Bank of America
ACH R/T 323070380

138
24-7038/

990 594 # 08

4/25/2011

223

PAY TO THE
ORDER OF   Matt King    1 03 1    $ ***15,000.00

Fifteen Thousand and 00/100************************************************ DO

Matt King
5415 NE 32ns Place
Portland, OR 97211

MEMO

AUTHORIZED SIGNATURE

⑈0013⑊3⑈ ⑉323070380⑊ ▮▮▮ 1841⑈

OnPoint CCU >323875898< ED042511 S13 D23



**ORION SHIP AGENCY** LLC

3438 N.E. Sandy Blvd. · Suite 292 · Portland, OR 97232 · Fax: 503-524-5829

May 5, 2012

*224*

On this day Matt King has received $15,000 USD (Fifteen thousand and 00/100). Orion paid to Matt $15,000 in May of 2011, including $5,000 returned from initial investment by Matt into the company, and $10,000 for work performed. This payment as agreed by Matt King and Stephen King is full and final for purchase of any ownership interest held by Matt King.

Upon completion of this transaction Orion Ship Agency, it's part and assets are 100% under the ownership of Stephen King.

_____
Matt King

_____
Stephen King

**Exhibit 5 - Page 1 of 1**

Case 13-03249-tmb    Doc 30    Filed 04/08/14



**Amendment to Annual Report - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - http://www.FilingInOregon.com - Phone: (503) 986-2200

**FILED**

**JUL 19 2011**

**OREGON**
**SECRETARY OF STATE**

REGISTRY NUMBER: 645241-93

ENTITY TYPE: ☒ DOMESTIC  ☐ FOREIGN

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is public record.
We must release this information to all parties upon request and it will be posted on our website.

For office use only

Please Type or Print Legibly in **Black** Ink.

1) **NAME OF ENTITY:** ORION AGENCY LLC

2) **PRINCIPAL PLACE OF BUSINESS:** (Street Address)
817 SHERMAN AVE
HOOD RIVER OR 97031

3) **ADDRESS FOR MAILING NOTICES:**
817 SHERMAN AVE
HOOD RIVER OR 97031

4) **THE REGISTERED AGENT HAS BEEN CHANGED TO:**
STEPHEN EVERETT KING

5) **THE NEW REGISTERED AGENT HAS CONSENTED TO THIS APPOINTMENT.**

6) **ADDRESS OF THE NEW REGISTERED OFFICE:** (Must be an <u>Oregon Street Address</u> which is identical to the registered agent's business office.)
817 SHERMAN AVE
HOOD RIVER OR 97031

7) **THE STREET ADDRESS OF THE NEW REGISTERED OFFICE AND THE BUSINESS ADDRESS OF THE REGISTERED AGENT ARE IDENTICAL.**

8) **NOTIFICATION:**
☒ The entity has been notified in writing of this change.

**LIST MEMBERS AND/OR MANAGERS NAMES AND ADDRESSES**

9) **MEMBERS:** (Name and street address)
STEPHEN EVERETT KING
817 SHERMAN AVE
HOOD RIVER OR 97031

10) **MANAGERS:** (Name and street address)
STEPHEN EVERETT KING
817 SHERMAN AVE
HOOD RIVER OR 97031

11) **EXECUTION:** (Must be signed by at least one member or manager.)
By my signature, I declare as an authorized authority, that this filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

Signature: *[signature]*

Printed Name: STEPHEN EVERETT KING

Title: PRESIDENT / OWNER

Date: JUNE 28, 2011

**CONTACT NAME:** (To resolve questions with this filing.)
STEPHEN EVERETT KING

**PHONE NUMBER:** (Include area code.)
503-704-1643

ORION AGENCY LLC

64524193-12834957  AAR

120 - Amendment to Annual Report - Limited Liability Company (07/10)

Exhibit 6 - Page 1 of 1



PROPOSAL FOR THE PURCHASE OF NORTH AMERICAN SHIPPING AGENCIES

Christos,

At this time we would like to submit for your review the following proposal for the purchase of NASA :

$30,000USD Cash at time of signing
40% of NASA's Net Profit until $150,000 total paid
      Net Profit to be Gross Profit minus Overhead fixed at 25%
Monthly payments at $3,000/ month with any adjustments to be made annually at end of fiscal year.

ORION will manage all daily operations, bank accounts, email, taxes, billing, etc.

Your duties would include :
Semi Annual contacts to all clients (phone call) for 2 years
Personal phone call and email thank you for all appointments
1 Trip to Greece a year for each of 2 years at ORION expense
1 Trip to New Orleans at ORION expense
1 Trip to Vancouver BC at ORION expense

At signing of contract, ORION will receive :
Full Contact list of all clients
All documents and forms (Schedule of Fees, operations procedures, etc)
Soft Copy of all records
Email Passwords and documentation of ownership of domain
Rights to NASA name, domain, etc.

If this is acceptable, we would like to make the appropriate changes to your contract and proceed from there.

**ORION SHIP AGENCY**

**Pacific North West**

**Columbia River District   Grays Harbor   Puget Sound   Seattle   Tacoma**

1

2

3

4

5

6

7

8    THE CIRCUIT COURT OF THE STATE OF OREGON

9    FOR THE COUNTY OF MULTNOMAH

10

| | |
|---|---|
| ORION AGENCY LLC, an Oregon limited liability company, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1) **Breach of Contract**<br>2) **Breach of Duty of Good Faith and Fair Dealing** |
| ANDREAS PAPACHRISTOPOULOS, an individual, JAMES PAPACHRISTOPOULOS, an individual, CHRISTOS EFTHIMIADIS, an individual, and NORTH AMERICAN SHIPPING AGENCIES, LLC, a Washington limited liability company, | 3) **Fraud**<br>4) **Intentional Interference with Prospective Business Advantages and Expectancies**<br>5) **Tortious Interference with Contractual Relationships** |
| Defendants. | **Claim Subject to Mandatory Arbitration** |

## **COMPLAINT**

Plaintiff Orion Agency LLC ("Plaintiff") for his complaint against defendants Andreas Papachristopoulos, James Papachristopoulos, Christos Efthimiadis ("Efthimiadis") and North American Shipping Agencies, Inc. ("NASA") (collectively "Defendants") alleges as follows:

## **PARTIES**

1.

Page 1 -  Complaint

1    Plaintiff is an Oregon limited liability company, doing business in the City of Portland,

2    County of Multnomah.

3                                         2.

4    On information and belief, Andreas Papachristopoulos is resident of the County of

5    Washington, doing business in Washington County.

6

7                                         3.

8    On information and belief, James Papachristopoulos is resident of the County of

9    Multnomah.

10                                        4.

11   On information and belief, Efthimiadis is resident of the County of Multnomah.

12

13                                        5.

14   On information and belief, NASA is a Washington limited liability company, doing

15   business in the City of Portland, County of Multnomah.

16                    **FACTS COMMON TO ALL CLAIMS**

17                                        6.

18   Plaintiff is a ship agency, formed to purchase the former ship agency Orion Ship Agency

19   LLC ("OSA") from its owner, defendant Andreas Papachristopoulos.   That purchase occurred

20   on January 1, 2010.  Concurrently with the purchase of OSA, Plaintiff entered into a consulting

21   agreement ("Agreement") with defendant Andreas Papachristopoulos.   A true and correct copy

22   of the Agreement is attached hereto as Exhibit A.

23

24                                        7.

25   Pursuant to the Agreement, defendant Andreas Papachristopoulos was to provide

26

MCNAMER AND COMPANY
1400 S.W. Fifth Avenue · Suite 300
Portland, Oregon  97201

Exhibit 8 - Page 2 of 12

Case 13-03249-tmb    Doc 30    Filed 04/08/14

1  consulting services to Plaintiff through January 1, 2015.  Effectively, Andreas Papachristopoulos

2  was to mentor Plaintiff's representatives, help continue to build Plaintiff's business, and refrain

3  from competing against Plaintiff in any manner.  As material consideration for the Agreement,

4  Andreas Papachristopoulos agreed to not, directly or indirectly:

5

6      (1)    Engage within West Coast, Pacific Rim (countries bordering the North of South Pacific Oceans), in the business of shipping port representation, or in any other business that competes with the business conducted by [Plaintiff] on the date that Employee's employment with Company terminates for any reason . . . .

7

8

9      (2)    For the benefit of Consultant or any other person or enterprise, (a) solicit any business whatsoever form any customer of Company, (b) induce or cause any customer to cease purchasing any service or product from Company or to terminate or change such customer's business relationship with the Company in any manner, or (c) induce or cause any supplier to cease providing or selling any service or product to the Company or to terminate or chance the supplier's business relationship with the Company in any manner.

10

11

12

13

14  Agreement, Section 10.1.1

15                             8.

16  The Agreement further provides that "Consultant shall be deemed to be indirectly

17  engaged in a business covered by Section 10.1.1(1) if Consultant (1) owns an interest or

18  participates in the management, operation, or control of any enterprise that is engage in a

19  business covered by Section 10.1."

20                             9.

21

22  A ship's agent manages the operations and logistics of bringing a large, foreign flagged

23  vessel into U.S. waters for loading of products.  Ship's agents coordinate with the U.S. Coast

24  Guard, Customs and Boarder Protection and other federal and state agencies to make sure that

25  the vessel can load and otherwise operate during their visit to the USA.

26

MCNAMER AND COMPANY
1400 S.W. Fifth Avenue · Suite 300
Portland, Oregon  97201

Exhibit 8 - Page 3 of 12

1          10.

2          Defendant NASA is a competing ship agency formerly owned by Efthimiadis, and

3     currently owned by James Papachristopoulos, the son of Andreas Papachristopoulos.

4          11.

5          In approximately December 2012, Plaintiff entered into negotiation with Efthimiadis to

6     purchase NASA.  Those negotiations continued through April of 2013.  Indeed, during the

7

8     negotiations, Plaintiff managed daily operations for NASA in exchange for 50% of NASA's net

9     income.

10          12.

11          Pursuant to the Agreement, Andreas Papachristopoulos was asked to finalize the

12     negotiations for the purchase of NASA.   Indeed, Andreas Papachristopoulos told Plaintiff's

13

14     representatives, Matt and Steve King, that he had known Efthimiadis for many years and that he

15     would be the best person to finalize the purchase.

16          13.

17          Despite his representations, and in direct breach of the Agreement, Andreas

18     Papachristopoulos offered to purchase NASA for himself.   After being apprised of Andreas

19     Papachristopoulos's actions, Plaintiff demanded Andreas Papachristopoulos withdraw his

20     competing offer for the competitive business.  Andreas Papachristopoulos initially refused, and

21

22     when Plaintiff reminded him that he was breaching the Agreement, he specifically threatened to

23     have his son, James Papachristopoulos purchase NASA in a spurious effort to circumvent the

24     Agreement.

25

26

Page 4 -  Complaint

1

14.

2    Andreas Papachristopoulos made good on his threats and negotiated with Efthimiadis to

3 have his son purchase NASA, which purchase was finalized in April 2013.   Since the purchase

4 Andreas Papachristopoulos has assisted his son in the purchase and operation of NASA, and is

5 effectively controlling NASA in direct competition with Plaintiff.   Additionally, Andreas

6 Papachristopoulos has instructed Plaintiff's debtors not to pay debts owed to Plaintiff.

7

8

15.

9    Efthimiadis, James Papachristopoulos, and NASA were aware of the Agreement, and

10 James Papachristopoulos's non-competition obligations thereunder.   Andreas and Demitri

11 Papachristopoulos both were aware of Plaintiff's prospective business relationship with NASA.

12

**FIRST CAUSE OF ACTION**

13

14

**(Breach of Contract - Against Andreas Papachristopoulos)**

15

16.

16    Plaintiff realleges and incorporates by reference each and every allegation contained in

17 paragraphs 1 through 15 of this Complaint, as though set forth in full herein.

18

17.

19

20    The Agreement is a valid contract between the parties, and Plaintiff has fully performed

21 his duties under the Agreement.

22

18.

23    Andreas Papachristopoulos has materially breached the Agreement.

24

25

26

MCNAMER AND COMPANY
1400 S.W. Fifth Avenue · Suite 300
Portland, Oregon  97201

Exhibit 8 - Page 5 of 12

Case 13-03249-tmb    Doc 30    Filed 04/08/14

1   19.

2      As a direct and proximate result of Defendant's breach of contract, Plaintiff has suffered

3   pecuniary and general damages in an amount in excess of $3,258,461.00, and other pecuniary

4

5   and general damages to be determined at trial, along with consequential and incidental damages.

6                    **SECOND CAUSE OF ACTION**

7      **(Breach of the Implied Covenant of Good Faith and Fair Dealing –**

8              **Against Andreas Papachristopoulos)**

9                            20.

10     Plaintiff realleges and incorporates by reference each and every allegation contained in

11  paragraphs 1 through 19 of this Complaint, as though set forth in full herein.

12                           21.

13

14     Implied as a matter of law in the terms of every contract, including Agreement, is a

15  covenant by each party not to do anything which will deprive the other parties thereto of the

16  benefits of the contract – the so called covenant of good faith and fair dealing.  When he entered

17  into the Agreement, the Andreas Papachristopoulos covenanted to perform in good faith and to

18  deal fairly with Plaintiff in all respects related to the subject matter of the Agreement.

19                           22.

20

21     By sabotaging Plaintiff's attempt to purchase NASA, and then negotiating for the

22  purchase of NASA for himself, and by later conspiring with his son to purchase NASA "in his

23  son's name," and thereafter directly competing against Plaintiff, Andreas Papachristopoulos

24  prevented Plaintiff from enjoying the benefits of the Agreement, thereby breaching his duty of

25  good faith and fair dealing.

26

Page 6 -  Complaint

1          23.

2          As a direct and proximate result of Andreas Papachristopoulos's constructive and actual

3    breach of the covenant of good faith and fair dealing, Plaintiff has suffered pecuniary and general

4    damages in an amount in excess of $3,258,461.00, and other pecuniary and general damages to

5
     be determined at trial, along with consequential and incidental damages.
6

7                        **THIRD CAUSE OF ACTION**

8                   **(Fraud – Against Andreas Papachristopoulos)**

9          24.

10         Plaintiff realleges and incorporates by reference each and every allegation contained in

11   paragraphs 1 through 23 of this Complaint, as though set forth in full herein.

12         25.

13
           By virtue of his superior knowledge of material facts, Andreas Papachristopoulos had the
14

15   duty to disclose the fact that 1) he intended to sabotage the purchase of NASA by Company, and

16   2) after sabotaging the purchase by Plaintiff, he intended to purchase NASA for himself, and 3)

17   that he was conspiring with his son to purchase NASA in his son's name in a spurious attempt to

18   avoid his obligations under the Agreement.

19         26.

20
           Andreas Papachristopoulos's breached his duty to disclose, willfully and maliciously for
21

22   the purpose, and with the intent of avoiding his obligations under the Agreement, and

23   benefitting, for himself and his family, from the purchase of NASA and from the profits realized

24   from NASA through competing against Plaintiff.

25

26

Page 7 -  Complaint

1                                            27.

2        Plaintiff was ignorant of these material facts, which Andreas Papachristopoulos's failed

3 to disclose.  Plaintiff reasonably relied on Andreas Papachristopoulos's representations and

4 failure to disclose material facts.

5                                            28.

6

7        As a proximate result of Andreas Papachristopoulos's fraud, Plaintiff has suffered

8 pecuniary and general damages in an amount in excess of $3,258,461.00, and other pecuniary

9 and general damages to be determined at trial, along with consequential and incidental damages.

10 Andreas Papachristopoulos's conduct as described above was willful and malicious and Plaintiff

11 intends to move to amend this complaint to include a claim for punitive damages.

12                         **FOURTH CAUSE OF ACTION**

13
             **(Intentional Interference with Prospective Business**

14
                      **Advantages and Expectancies –**

15
16     **Against Andreas Papachristopoulos and Demitri Papachristopoulos)**

17                                      29.

18        Plaintiff realleges and incorporates by reference each and every allegation contained in

19 paragraphs 1 through 28 of this Complaint, as though set forth in full herein.

20                                        30.

21

22        Plaintiff had reasonable expectancies of 1) performing shipping agency services for past

23 and future clients, and 2) purchasing NASA.

24                                      31.

25        Andreas Papachristopoulos and Demitri Papachristopoulos knew or should have known

26

Page 8 -  Complaint

1    that these business expectancies existed.

2                                     32.

3        Andreas Papachristopoulos and Demitri Papachristopoulos, through words or conduct, or

4    both, intentionally and improperly interfered with Plaintiff's business expectancies.

5                                     33.

6

7        As a direct and proximate result of Andreas and Demitri Papachristopoulos's words or

8    conduct, or both, Plaintiff has suffered pecuniary and general damages in an amount in excess of

9    $3,258,461.00, and other pecuniary and general damages to be determined at trial, along with

10   consequential and incidental damages. Andreas and Demitri Papachristopoulos's words or

11   conduct, or both, as described above was willful and malicious and Plaintiff intends to move to

12   amend this complaint to include a claim for punitive damages.

13                        **FIFTH CAUSE OF ACTION**

14                **(Intentional Interference with Prospective Business**

15                        **Advantages and Expectancies -**

16               **Against Demitri Papachristopoulos, Efthimiadis, and NASA)**

17

18                                     34.

19       Plaintiff realleges and incorporates by reference each and every allegation contained in

20   paragraphs 1 through 33 of this Complaint, as though set forth in full herein.

21

22                                     35.

23       Plaintiff had reasonable expectancies of 1) performing shipping agency services for past

24   and future clients, and 2) being provided consultation services by Andreas Papachristopoulos, 3)

25   Andreas Papachristopoulos refraining from directly or indirectly competing against Plaintiff.

26

Page 9 - Complaint

36.

Demitri Papachristopoulos, Efthimiadis, and NASA, knew or should have known that these business expectancies existed.

37.

Demitri Papachristopoulos, Efthimiadis, and NASA, through words or conduct, or both, intentionally and improperly interfered with Plaintiff's business expectancies.

38.

As a direct and proximate result of Demitri Papachristopoulos, Efthimiadis, and NASA's words or conduct, or both, Plaintiff has suffered pecuniary and general damages in an amount in excess of $3,258,461.00, and other pecuniary and general damages to be determined at trial, along with consequential and incidental damages. Demitri Papachristopoulos, Efthimiadis, and NASA's words or conduct, or both, as described above was willful and malicious and Plaintiff intends to move to amend this complaint to include a claim for punitive damages.

**SIXTH CAUSE OF ACTION**

**(Tortious Interference with Contractual Relationships -**

**Against Demitri Papachristopoulos, Efthimiadis, and NASA)**

39.

Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 38 of this Complaint, as though set forth in full herein.

40.

Plaintiff entered into the Agreement with Andreas Papachristopoulos.

41.

Page 10 - Complaint

1    Demitri Papachristopoulos, Efthimiadis, and NASA, knew or should have known of that

2    contractual relationship.

3                                    42.

4    Demitri Papachristopoulos, Efthimiadis, and NASA, through words or conduct, or both,

5    intentionally and improperly interfered with Andreas Papachristopoulos's performance of the

6    Agreement.

7

8                                    43.

9    As a direct and proximate result of Demitri Papachristopoulos, Efthimiadis, and NASA's

10   words or conduct, or both, Plaintiff has suffered pecuniary and general damages in an amount in

11   excess of $3,258,461.00, and other pecuniary and general damages to be determined at trial,

12   along with consequential and incidental damages. Demitri Papachristopoulos, Efthimiadis, and

13   NASA's words or conduct, or both, as described above was willful and malicious and Plaintiff

14   intends to move to amend this complaint to include a claim for punitive damages.

15

16                       **NINTH CLAIM FOR RELIEF**

17        **(Violation of Oregon Unlawful Trade Practices Act – ORS § 646.605 et seq.**

18                          **– Against All Defendants)**

19                                    44.

20   Plaintiff realleges and incorporates by reference each and every allegation contained in

21   paragraphs 1 through 43 of this Complaint, as though set forth in full herein.

22

23

24

25

26

Page 11 - Complaint

1                                         45.

2          Defendants have disparaged Plaintiff's services and/or business by making one or more

3 false or misleading representations of fact in violation of ORS §646.608(1)(h), and have engaged

4 in other unfair and deceptive conduct in trade or commerce  in violation of ORS §646.608(1)(u).

5                                         46.

6

7          Plaintiff has been injured in the course of its business as a result of Defendants' unlawful

8 trade practices.

9                                         47.

10         As a direct and proximate result of Defendants' unlawful trade practices, Plaintiff has

11 suffered pecuniary and general damages in an amount in excess of $3,258,461.00, and other

12 pecuniary and general damages to be determined at trial, along with consequential and incidental

13 damages.  Pursuant to ORS 646.638(3), Plaintiff is also entitled to its attorneys fees.

14

15                       **PRAYER FOR RELIEF**

16         WHEREFORE, Plaintiff prays for judgment as follows:

17     1.       For pecuniary and general damages in an amount in excess of $3,258,461.00;

18     2.       For its attorneys fees under ORS 646.638(3); and

19     3.       For such other and further relief as the Court deems just and proper.

20 DATED this 19th day of June, 2013.

21                       M<small>C</small>N<small>AMER AND</small> C<small>OMPANY</small>, P.C.

22

23

24                    By _____
                          Anthony McNamer, Esq., OSB#00138

25                         Attorneys for Plaintiff

26

Page 12 -  Complaint

You were always interested to buy Nasa but only under your terms, which christos turned down. I don't really care what you think is the best way to proceed. You will not negotiate with Christos alone because you know that he will not sell to you. Did you forget already? there is nothing to negotiate. Either Orion will buy Nasa and you will pay me under the terms of our consulting agreement or I will buy and sell to you 50% under the terms that I offered: 50-50 ownership and $10,000 sale to you at the end of 5 years. If these terms are not acceptable to you Jimmy will buy Nasa.
You let us know if you agree.

andy


On 3/2/2013 8:56 AM, steve king wrote:

> Andy,
>
> We did meet with Christos and the subject of purchasing NASA did come up. We were surprised at first to realize that you had mentioned nothing to Christos about the "whole thing being dead". We did not change anything about Christos' understanding of any of the negotiations to this point. We did not want to proceed unilaterally as we are still interested in making this work for all 4 of us.
>
> We think the best way to proceed would be for you to let Christos know that you are not going to continue with negotiations and that Matt and Steve will contact him directly. Then you, Matt, and I can try to agree to a situation that is workable.
>
> Alternately, you could suggest something that has not yet been considered, but the one line emails from you are not helping.
>
> Steve
>
> On Fri, Mar 1, 2013 at 10:34 PM, Andy Papachristopoulos <andyp@orion-ship.com> wrote:
>> Christos said that you met yesterday and you talked about the purchase of nasa. He and I would like to know where you stand on this.
>>
>> andy

Andy,

Matt and I are interested in buying NASA.

Steve

On Sat, Mar 2, 2013 at 3:08 AM, Andy Papachristopoulos <andyp@orion-ship.com>
wrote:
> Christos and i would like to have your decision this weekend because if you are
> not interested to buy nasa Jimmy will.
>
> andy

| From: | steve king |
| To: | Andy Papachristopoulos |
| Cc: | matt king |
| Subject: | Nasa |
| Date: | Sunday, February 03, 2013 1:39:08 PM |

Andy,

We wanted to get back to you before your next meeting with Christos. We've gone over your proposal again and it makes a lot of sense at this point. We are excited and see a lot of opportunity from adding Nasa income to our operations. There are still some points to iron out.

Some questions for you on how we will structure this and handle operations:

How do we handle new business over the next 5 year period?
How do we split or pay for travel and other outreach expenses?
Do you plan to do the DAs for Nasa or have me do them?
At the end of the month do we exchange checks for the Orion and Nasa deals respectively?
Stuff like that...

These are not things we need answers on today, but would like to know what you think.

Do you need anything else from us to proceed with this deal?

Steve

**From:** Andy Papachristopoulos
**To:** ORION - OPS
**Subject:** nasa
**Date:** Friday, February 01, 2013 5:43:36 AM

steve, matt,

I want you to rethink this whole matter of you buying nasa because if I
do not contribute 40% of the purchase price, you will be making 69,880
for the next 3 years instead of 89,880 that you have calculated.  And I
will not contribute 40% of the purchase price because I will not buy 40%
of nasa.
If I buy nasa and give you 20% for the first 3 years, at 120,000 income
from nasa plus 60% of Orion 140,000, you will make 85,000 and the next 2
years 97,000.  can you afford to live with 69,880?  And at the end of 5
years you will pay $1,000 to buy nasa instead of 150,000.
Let me know before 0900 this morning so that I will know what to say to
christos.

andy

Matt, Steve,

Further to my previous message, if I were to buy 40% of nasa then what you proposed is fair, but I am not buying nasa, you are.
I don't want to change your minds, but with my proposal, (Andy buying nasa) you will be better off financially especially after the first 3 years.  run the numbers with 140,000 from Orion and 120,000 from nasa and you will see what I am saying.

andy

Steve, Matt,

on the nighthawk lets plan on two d/a one for GH and one for Port Angeles with $600 for each port.

on the calculations for Andy's income from NASA two things:
1. my question about taking the 27% on the 120,000 or the 70,000 I believe the 27% should be deducted from the entire income form nasa.
  2. after you deduct the 27% you deducted the $50,000 to Christos as an additional expense.  If you do this, then in effect I'll pay 40% of the purchase price to Christos which I  think is not fare.
Orion earns an additional 120,000 from nasa, we deduct 27% and I am entitled to 40% for the next 3 years.  We need an amendment to our agreement because it says I am entitled to 50% but I agreed with Matt that I will take 40%

Andy

**From:** Andy Papachristopoulos
**To:** ORION - OPS
**Subject:** NASA
**Date:** Tuesday, January 22, 2013 6:12:38 PM

Matt,    Steve,

Christos called me after Matt's meeting and he said that he decided that
he cannot accept the terms of percentage payment for NASA.
You guys talk and decide what you want to do.  If I owed Orion I would
not hesitate to accept $150,000 payable in 3 years

Andy

## 1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON

In re:                          )
                                )
Matthew Read King,              )
                                )
            Debtor.             )   No. 13-33284-tmb7
_____ )
                                )
Andreas Papachristopoulos       )
and Demetrios                   )
Papachristopoulos,              )
                                )
            Plaintiffs,         )
                                )
      v.                        )
                                )
Matthew Read King,              )
                                )
            Defendant.          )
_____ )

DEPOSITION OF ANDREAS PAPACHRISTOPOULOS
Taken in behalf of the Defendant
* * *
March 4, 2014

## 2

```
          BE IT REMEMBERED that the deposition of
ANDREAS PAPACHRISTOPOULOS was taken before Amy A.
Dalton, Court Reporter and Notary Public, on March
4, 2014, commencing at the hour of 1:03 p.m., in the
conference room of the law firm of Motschenbacher &
Blattner, in the City of Portland, County of
Multnomah, State of Oregon.

          APPEARANCES:

THE SCOTT LAW GROUP
     Counsel for Plaintiff
     497 Oakway Rd, Ste 245
     Eugene, OR 97401
     BY NATALIE C. SCOTT
        nscott@scott-law-group.com

CHOCK BARHOUM
     Counsel for Plaintiff
     121 SW Morrison St, Ste 415
     Portland, OR 97204
     BY ADINA MATASARU
        adina.matasaru@chockbarhoum.com

MATSCHENBACHER & BLATTNER
     Counsel for Defendant
     117 SW Taylor St, Ste 200
     Portland, OR 97204
     BY NICHOLAS J. HENDERSON
        nhenderson@portlaw.com
```

## 3

EXAMINATION INDEX

                                            Page
EXAMINATION BY MR. HENDERSON                  4
EXAMINATION BY MS. MATASARU                  77


EXHIBIT INDEX

Exhibit          Description             Page

  19    Agreement for Sale and Purchase of  15
        Business Assets
  20    Typewritten calculations            67
  21    E-mail to Orion-OPS from Mr.         70
        Papachristopoulos dated 2-5-13

## 4

1          ANDREAS PAPACHRISTOPOULOS
2   was thereupon produced as a witness in behalf of the
3   Defendant and, having first been duly sworn, was
4   examined and testified under oath as follows:
5
6   EXAMINATION BY MR. HENDERSON:
7       Q.  Good afternoon, Mr. Papachristopoulos.  My
8   name is Nick Henderson.  We met before, but I want
9   to introduce myself on the record.  I represent
10  Matthew King in his bankruptcy adversary proceeding
11  case that you've filed against him.  Before we get
12  started, will you please state and spell your name
13  for the record?
14      **A.  Yes.  My name is Andreas, A-N-D-R-E-A-S,**
15  **Demitrios, D-E-M-I-T-R-I-O-S, Papachristopoulos,**
16  **P-A-P-A-C-H-R-I-S-T-O-P-O-U-L-O-S.**
17      Q.  Thank you.
18          Mr. Papachristopoulos, have you ever had
19  your deposition taken before?
20      **A.  Yes.**
21      Q.  When was that?
22      **A.  That was in the '80s sometime.**
23      Q.  Only once?
24      **A.  A deposition -- let's see.  I believe so,**
25  **yes.**

5

1   Q.  Okay.  What kind of case was that?
2   **A.  This was a case where I used to own,**
3   **with -- with another investor, an adult foster-care**
4   **home, and one of the residents or the family of the**
5   **resident filed a lawsuit against us.**
6   Q.  Okay.  Well, since it's been a while, I'm
7   going to cover some of the ground rules for
8   depositions.  You heard your counsel talk about some
9   of these issues before, but bear with me, please.
10      You understand that you're testifying under
11  oath?
12  **A.  Yes.**
13  Q.  And your testimony here carries with it the
14  penalty of perjury?
15  **A.  Yes.**
16  Q.  And that even though we're not in a
17  courtroom and there's not a judge here, your
18  testimony is to be taken as seriously as if it were
19  in court?
20  **A.  Yes.**
21  Q.  Okay.  The next issue that we'll talk about
22  is that I need you to answer audibly.  Nodding or
23  shaking of the head or giving me answers like
24  "uh-huh" or "huh-uh," they don't really work for the
25  written record, so please give me clear, audible

6

1   answers.
2   **A.  Yes.**
3   Q.  Okay.  We can take a break at any time.
4   Just let me know if you need to step out.  My only
5   request is that if I have an answer -- or a question
6   pending, please answer my question before we take a
7   break.
8   **A.  Sure.**
9   Q.  And, finally, it's important that we don't
10  speak over each other.  If I'm asking you a question
11  and you think you know where I'm going with
12  something, please wait until I'm finished with my
13  question before you start to answer, and I will try
14  to do the same for you.
15  **A.  Sure.**
16  Q.  It's inevitable that one of us will forget
17  that rule as we go along, but I'm sure that the
18  court reporter will remind us.
19      As I ask you questions, if there's anything
20  you don't understand, please let me know.  I'm happy
21  to rephrase my questions.  If you answer my
22  question, I'm going to assume that you understood
23  it.
24      Is that fair?
25  **A.  Yes.**

7

1   Q.  Okay.  Any reason you cannot testify
2   truthfully today?
3   **A.  No.**
4   Q.  Are you on any medication that affects your
5   memory?
6   **A.  Nope.**
7   Q.  Okay.  Any health condition that would do
8   the same?
9   **A.  No.**
10  Q.  Okay.  Have you talked to anyone other than
11  your lawyers about getting ready for today's
12  deposition?
13  **A.  No.**
14  Q.  Okay.  You didn't talk to your son at all
15  about today's deposition?
16  **A.  No.**
17  Q.  Okay.
18  **A.  He knows that I'm going to -- to be**
19  **deposed, but we did not discuss anything.**
20  Q.  Okay.  Are you married, sir?
21  **A.  Yes.**
22  Q.  Okay.  Did you talk to your wife about
23  getting ready for today?
24  **A.  I talked to her that I will be deposed.**
25  Q.  But no other substance?

8

1   **A.  No.**
2   Q.  Okay.  Did you review any documents to
3   prepare for this deposition?
4   **A.  Yes, I have reviewed some documents.**
5   Q.  Okay.  Can you recall what those were?
6   **A.  Some of the e-mails that I have here**
7   **(indicating).**
8   Q.  Okay.  And are those e-mails that we looked
9   at in --
10  **A.  Yes.**
11  Q.  -- this binder, Volume 1?
12  **A.  Yes.**
13  Q.  Okay.  Just be careful we don't speak over
14  each other.
15  **A.  That's right.  You're right.**
16  Q.  Sir, you've brought this adversary
17  proceeding, I assume, because you believe my client
18  owes you money?
19  **A.  Yes.**
20  Q.  Okay.  In your own words, can you tell me
21  how much my client owes you?
22  **A.  Well, the amount that your client owes me**
23  **for 2013 is approximately 15 or $17,000, and then I**
24  **feel that I have lost the revenue for three years**
25  **from refusing to purchase North American Shipping**

**Exhibit 10 - Page 2 of 20**
Case 13-03249-tmb   Doc 30   Filed 04/08/14

9

1  Agency, which would probably be about 200 and --
2  $225,000.
3      Q.  And you said that's because, in your
4  opinion, it's my client, Matthew King's refusal to
5  purchase North American Shipping Agency?
6      A.  He and his brother, yes.
7      Q.  Okay.  Okay.
8          Stepping back a little bit, how long have
9  you known my client?
10     A.  I would say it was the beginning of 1980,
11  the early '80s, when they moved from -- his family
12  moved from California to the Raleigh Hills area
13  where we used to live.  His brother, Steve, was the
14  same age, going to the same school with my son
15  Demitri, and, actually, Matt was going to the same
16  school as my daughter.  Steve was in the soccer team
17  that I was coaching at the time, and this is how I
18  got to know the family.
19     Q.  Okay.  And can you please tell me a little
20  bit about your business background?
21     A.  Well, I -- I started my own business in
22  Greece in 1965 or 1966, I think it was December of
23  '65, as a manufacturer's representative.  It was a
24  very successful business, but in 1967 there was a
25  military coup that took over the government that was

10

1  a dictatorship, and after spending two years under
2  the dictatorship, my wife and I decided to return to
3  the United States.  Here in the United States I
4  started an import/export business, which, after
5  about a year, because there was a longshore strike
6  that lasted for six months, therefore I could not
7  import or export anything, I closed the company.
8  And then I got into shipping, the shipping business.
9      Q.  Okay.  And when did you get in the shipping
10  business?
11     A.  Actually, I got into the shipping business
12  in 1970, beginning of 1970.
13     Q.  Okay.  And did you start your own business
14  at that time or --
15     A.  No.
16     Q.  -- were you working for someone else?
17     A.  No.  No.  I was working for another
18  company.
19     Q.  Okay.  Do you remember the name of the
20  company?
21     A.  The company was called Monarch Steamship.
22     Q.  Okay.  And what did you do for that
23  company?
24     A.  I was in operations.
25     Q.  Okay.  And how long were you doing that?

11

1      A.  I did that for two years and then -- I
2  should correct myself.  I started that, I did it for
3  two years, and then I started my import/export
4  company, and then I got back into the -- into
5  shipping again.
6      Q.  Okay.  I understand.
7          And were you doing operations when you got
8  back into the shipping business?
9      A.  Yes.  I started.
10     Q.  Okay.  And you did that for two years then?
11     A.  No.  The first time I did it for two years;
12  the second time I did it for 20 -- for 18 years.
13     Q.  Eighteen years.  All with that same
14  company?
15     A.  Yes.
16     Q.  Okay.  And then what did you do?
17     A.  And then I started Orion Ship Agency.
18     Q.  And when did you start that, sir?
19     A.  1997.
20     Q.  And was it always a limited liability
21  company?
22     A.  Yes.
23     Q.  Okay.  Were you the only member?
24     A.  Yes.
25     Q.  Was it always that way?

12

1      A.  Yes.
2      Q.  Okay.  And how did it come about that you
3  were looking to sell your business to Matthew and
4  Stephen King?
5      A.  Well, their father is -- used to be my best
6  friend.  We used to go skiing together.  We used to
7  play tennis together in the summertime and spring.
8  We used to sail with my sailboat, so we spent a lot
9  of time together.  In one of the trips skiing, I
10  mentioned that I was thinking of selling the company
11  at some point and -- and Mike, their father, his
12  reaction was, "Would you consider selling your
13  company to Steve and Matt?  We would like -- Steve
14  used to live in San Francisco at the time, and they
15  said, "We would like to have them here in Portland
16  so that we can see the grandkids, and would you
17  consider doing that?"  So this is how it all
18  started.
19     Q.  Okay.  And did you think that Matt and
20  Steve King would be a good fit for your line of
21  work?
22     A.  Well, I had no way to make a judgment at
23  the time what kind of people they were.  The only
24  thing that I had to evaluate was what kind of
25  parents they had, and I thought, yes.  I thought at

3 (Pages 9 to 12)

13

1   the time that they would be a good fit. It would be
2   a good fit, that they -- that they should be able to
3   learn the business and -- and be successful in
4   carrying over.
5       Q.   Okay. So after Mike King presented that
6   idea to you, how did things progress?
7       A.   After the -- they did this, after that
8   discussion, they -- Matt arranged a meeting. So he
9   came over and I told him what the business was all
10  about, and I asked him if he wanted to learn the
11  business and he can start helping out so that he can
12  see what this is all about, so this is how we
13  started. I start taking him out to the ships. I
14  start telling him -- spending some time in the
15  office. And after about, I don't know, maybe six
16  months of this, he thought that -- he was awfully
17  excited. He thought that this was a great business.
18  He talked to his brother, Steve, to move up here so
19  that he can take over.
20      Q.   Okay. And did you have any discussions
21  with Matt or Steve King at that time, when you were
22  looking to sell the business or thinking about
23  selling the business to them, about what you thought
24  the company was worth, Orion Ship Agency?
25      A.   Well, we did not have any direct

14

1   discussions about what it was. The way it happened
2   was that before they bought the company, in other
3   words, in 2009, Matt -- I was going on a trip to the
4   Far East, and Matt says, "Can I come with you?" And
5   I said, "Well, it's not appropriate, but if you --
6   if you really" -- "Please," he says, "I would love
7   to come." I says, "Well, go ahead and come."
8       On the plane, he -- I was flying business
9   class, and he came to business class, and he says,
10  "This is a contract that I have drafted" or "that we
11  have drafted," I guess. "We" or "I." "Would you
12  mind looking at it?" We had, you know, several
13  hours of flying time. So I looked at it, and I was
14  offended. I was offended because he had put down
15  that the value of the company was worth $1. And if
16  it wasn't for his father, I would have said, "You
17  know what, you guys, I don't want to talk to you
18  anymore." But because as a courtesy to his father
19  and Steve had already moved up here, you know, we
20  started a conversation as to, you know, what was
21  going to be, the value, how we're going to come to
22  the -- a value for the company.
23      Q.   Okay. And what -- can you recall the
24  substance of those discussions?
25      A.   Well, we had a number of discussions, and

15

1   they sort of insisted that the value of the company
2   was no more than $5,000. And -- and then -- then we
3   had the consulting agreement. The consulting
4   agreement was that I was going to teach them how to
5   become agents. I was going to mentor them. I was
6   going to introduce them to all my clients, and I was
7   going to make -- to make a smooth transition from
8   Andy to Steve and Matt after -- after the fourth
9   year. And -- and for that, with all the training
10  and the introduction and so forth, I was going to
11  get 50 percent of the net profits. And we settled
12  on the $5,000 value, which I was still very unhappy.
13  But, again, I didn't want to, you know, cause
14  problems because of his parents --
15      Q.   Okay.
16      A.   -- the relationship that I had with his
17  parents.
18          (EXB. 19, Agreement for Sale and
19           Purchase of Business Assets, marked.)
20  BY MR. HENDERSON: (Continuing)
21      Q.   There you go.
22      A.   Okay.
23      Q.   Mr. Papachristopoulos, you've been handed a
24  document marked as Exhibit 19. Do you recognize
25  this document?

16

1       A.   Well, I will have to spend half an hour to
2   look it over to tell you if I recognize it or not.
3   I -- just by looking at the first page, it doesn't
4   mean anything to me. It doesn't say anything to me.
5   I don't know.
6       Q.   Okay. Take a look at the -- let me see
7   here -- page 13 of 17. At the bottom there's a
8   small, little writing that says "MKING000441."
9   There's a signature there above your name --
10      A.   Yes.
11      Q.   -- under the title "Consultant." Is that
12  your signature, sir?
13      A.   Yes, it is.
14      Q.   Okay. The contract on the first page, this
15  contract, document Exhibit 19, is dated May 10th,
16  2009?
17      A.   Okay.
18      Q.   Is that about the same time where you were
19  discussing the sale of your business to Matt and
20  Steve?
21      A.   Well, obviously, it is, but we're going
22  back to -- you know, five years now.
23      Q.   Sure.
24      A.   So my recollection was that it was quite a
25  bit later than that, but this thing doesn't lie and

17

```
1   it has better memory than I do.
2       Q.  Okay.  Tell me please, Mr.
3   Papachristopoulos, because I'm looking here at the
4   parties to this contract and in the section where it
5   says, "Buyer," it says, "Matthew King and Stephen
6   King, an Oregon corporation to be formed."  What was
7   your understanding about who you were entering into
8   this contract with?
9       A.  With Steve and Matt King.
10      Q.  Personally?
11      A.  Yes.
12      Q.  Okay.  And it was your understanding that
13  Matthew King and Stephen King would be paying you
14  this consulting fee directly?
15      A.  No.  They would -- the discussions were
16  that they were going to be paying me from the
17  profits --
18      Q.  Okay.
19      A.  -- of Orion.
20      Q.  Okay.
21      A.  From the Orion profits.
22      Q.  And so was it a company or a business
23  entity that was going to be writing checks to you?
24      A.  Yes.  It says here, "The corporation to be
25  formed."
```

18

```
1       Q.  Okay.
2           MS. SCOTT:  Nick, this says page 16 of 17.
3   Is there a missing page?
4           MR. HENDERSON:  Everything that's here is
5   all I have.
6           MS. SCOTT:  Okay.
7           MS. MATASARU:  Yeah.  We didn't have that
8   yesterday in what you produced either.
9           MS. SCOTT:  Okay.  Thank you.
10          BY MR. HENDERSON:  (Continuing)
11      Q.  Mr. Papachristopoulos, please turn to page
12  14 of 17 on Exhibit 19.  And this is the consulting
13  agreement you were talking about?
14      A.  Yes.
15      Q.  Okay.  And it says, "Parties:  Matthew King
16  and Stephen King, an impending Oregon corporation."
17  Do you see that there?
18      A.  Yes.
19      Q.  Okay.  So was it also your understanding
20  that this consulting agreement was going to be with
21  a corporation that Matt and Steve King would form?
22      A.  Yes.
23      Q.  Okay.
24      A.  Or I thought that they were going to assume
25  the same corporation that I had, Orion Ship Agency.
```

19

```
1   They decided not to do this.  They formed a
2   different corporation under the name "Orion,"
3   instead of "Ship Agency," "Orion Agency, LLC."
4       Q.  Did they tell you why they did that?
5       A.  No.  I didn't even know about it until I
6   looked at the corporate papers.
7       Q.  Okay.  Sir, if you would please turn to
8   Volume 1.  I'm looking at Exhibit 1 now, which is
9   the complaint that was filed in this case.  Do you
10  recognize this document, Exhibit 1?
11      A.  I have looked at it, yes.
12      Q.  Okay.  This is the complaint that was filed
13  on your behalf in this adversary proceeding?
14      A.  Yes.
15      Q.  Okay.  Did you review it before it was
16  filed?
17      A.  Yes.
18      Q.  Okay.
19      A.  I looked at it.
20      Q.  Is everything in this complaint true and
21  accurate, to the best of your knowledge?
22      A.  Yes.
23      Q.  Okay.  Please turn to Exhibit A, which is
24  about 11 pages back, Exhibit A of Exhibit 1.  This
25  is a document titled "Agreement for Sale and
```

20

```
1   Purchase of Business Assets," January 1st, 2010 is
2   the date, and this time on the "Buyer" designation,
3   it says, "Matthew King and Stephen King, Orion
4   Agency, LLC."  Do you see that there?
5       A.  Yes.
6       Q.  Okay.  So we heard some testimony from Matt
7   King and Steve King that there was an earlier
8   contract, and there was a later contract that
9   replaced the earlier contract?
10      A.  Yes.
11      Q.  Would you agree with that testimony?
12      A.  Yes.
13      Q.  Okay.  Just be careful not to speak over
14  me.
15      A.  Sorry.
16      Q.  Okay.  Thank you.
17          So Exhibit A of Exhibit 1, in your mind, is
18  this the contract under which you are owed 15 to
19  $17,000 for services in 2013?
20      A.  I believe so.  I will have to review the
21  consulting agreement to make sure that this is the
22  case.
23      Q.  Okay.  And that's Exhibit B of Exhibit 1.
24      A.  Okay.
25      Q.  Take a look at that for a moment.
```

**21**

1    A.   Yeah.  Well, if you want me to read the
2  whole thing, it's not going to take me a moment.  So
3  if you want -- if you want me to glance at it, I
4  will.  If you want me to read it, I will -- will
5  have to spend some time.
6    Q.   Take as much time as you need to --
7    A.   Okay.
8    Q.   -- to be familiar with the contract,
9  please.
10   A.   Okay.
11   Q.   Okay.  And on page 3 of 4 of Exhibit B, is
12  that your signature there, sir?
13   A.   Yes, it is.
14   Q.   Okay.  So in your own words, will you
15  please tell me what your understanding was of how
16  this consulting agreement was going to work?
17   A.   Well, it was going to be that we -- we --
18  we agreed on a formula as to what constitutes gross
19  profits and net profit.  And from the net profit, I
20  was going to receive, for the first three years, 50
21  percent, and for the next two years, I was going to
22  receive 40 percent of the -- of the net profits.
23   Q.   Okay.
24   A.   And for this, I was going to mentor them.
25  I was going to teach them the business, and I was

**22**

1  going to introduce them to all my clients.
2    Q.   From your years of experience in the
3  industry?
4    A.   Right.
5    Q.   Okay.  You heard some testimony, I believe,
6  that Matt King or Steve King said that the idea was,
7  even after Orion purchased your business, to have --
8  to kind of conceal it to the outside world that that
9  transaction had occurred and that the three of you
10  would still kind of represent to the public or to
11  your industry that you were still the owner of
12  Orion.  Did you hear that testimony?
13   A.   Yes.
14   Q.   Do you agree with that?
15   A.   Yes.
16   Q.   Okay.  Now, take a look at page 4 of 4 on
17  Exhibit B.  It says, "Addendum A.  Orion Financial
18  Process"?
19   A.   Yes.
20   Q.   Okay.  Is this -- does this document
21  reflect the formula that you just discussed about
22  how you would be paid under the consulting
23  agreement?
24   A.   Yes.
25   Q.   Okay.  So if you could, explain, in this

**23**

1  revenue box, your understanding of what the items in
2  this box mean.
3    A.   Okay.  In our business, when we are
4  appointed as agents, we prepare a proforma invoice
5  that we send to the owners, and we ask for a certain
6  amount, as little as $5,000, as much as $400,000, to
7  be sent to us up front.  After the vessel sails,
8  we -- we pay the bills, we pay all the vendors that
9  have provided services to the ship, and we prepare a
10  disbursement account.  We list all the invoices that
11  we have paid, and we send it to the owners, and we
12  say, "This is the balance.  This is how much you
13  still owe us" or "This is how much we are to refund
14  you."  So in this -- the first -- the first -- this
15  revenue column here, it describes that there are a
16  lot of funds -- from the $400,000 that we might
17  receive, 385 would probably be for -- to be paid to
18  vendors for the services that they've provided,
19  pilots, tugs, the elevators, and so forth.
20   Q.   Okay.  And so whatever's left over, is that
21  kind of -- I'm trying to understand this formula on
22  this page.  Whatever's left over after paying these
23  tugs, pilots, and dockage, that goes to the next box
24  here, "Gross Job Profit"?
25   A.   Yes.

**24**

1    Q.   Okay.  And so then the items listed here,
2  things like mileage, FedEx, wire transfer fees,
3  those are additional expenses that are then deducted
4  from the gross job profit?
5    A.   No.  This is additional -- some of it is
6  additional revenues and some of it -- well, no.  All
7  of it is additional revenues.  In other words, here
8  it says "Base Agency Fee."  What we will normally
9  charge is $4200 for the first five days.  Then --
10  and then we will charge $450 for each additional
11  day.  So if the ship was here for ten days, it will
12  be an additional $450 for -- for five days, so this
13  is additional days.  Then it says "Items from --
14  Items from schedule of fees."  Yes.  We had a
15  schedule of fees that said "communication," and we
16  will charge $250.  We will charge incidentals.  We
17  had -- I mean, everybody does in the industry, and
18  we will charge $250.  We also have mileage that we
19  will charge a minimum of $250.  If it was for trips
20  to Astoria and to Coos Bay or Grays Harbor, Seattle,
21  Tacoma, we will charge them at the rate of 65 cents
22  per mile.  FedEx, when we were sending FedEx
23  packages, because the captain would say, "I want you
24  to mail this package to my office," if it would cost
25  $85, we will charge maybe $95.  Wire transfers,

25

1  because we were getting all the moneys that were
2  being transferred, there was wires and -- and we
3  will charge 50 -- $50 for the wires, where the --
4  the banks will charge you 35, but we will -- we
5  would show it as a $50 charge.
6      So this is -- you know, for the Philippine
7  crew list, whenever we had -- whenever we had to --
8  a ship that was going to the Philippines, we had to
9  obtain a crew list, a special crew list that the
10  embassy of the Philippines prepares here, actually
11  in San Francisco. We will give it to the captain.
12  They will fill it out. Then we will have to send it
13  by DHL to San Francisco with a hundred dollar
14  cashier's check. Then they will send it back to us
15  after they stamp it, and then we will have to send
16  it to the discharge agent because he will have to
17  show this before the vessel arrives to the
18  authorities. And for this whole thing, we charged,
19  I don't know, $200. So where, you know, maybe it
20  cost us, you know, $100 for the -- as I said, for
21  the -- for the embassy, and then all the DHL
22  packages that we had to send, maybe it's 150, and we
23  will charge $200. So these are -- these are
24  additional expenses -- not additional expenses, but
25  additional revenue in addition to the revenue in the

26

1  first column.
2      Q. Okay. Thank you.
3          And then whatever's left over or whatever
4  was accumulated between the first and second
5  columns --
6      A. Right.
7      Q. -- then we move to the next column?
8      A. Yes.
9      Q. And we subtract expenses?
10      A. Yes.
11      Q. Okay. And rebates, what are rebates in
12  your line of work?
13      A. Well, we had some agreements with some of
14  the companies where we will send them a rebate,
15  yeah, here it says "Pilmico." With Pilmico, for
16  every ship we will send back to -- to the
17  Philippines $2300 for every ship.
18      Q. Kind of as a discount or --
19      A. A discount or --
20      Q. An incentive to do business with Orion?
21      A. Right.
22      Q. All right?
23      A. Yes.
24      Q. Okay. Then it says, "Minus overhead cap,"
25  which is the next box to the right.

27

1      A. Uh-huh.
2      Q. Are these expenses fixed overhead for the
3  business?
4      A. Well, some of it was fixed. Some others
5  were -- would vary. For example, the mileage. You
6  know, if you drive to Seattle, it's not going to be
7  the same as driving to Terminal 6 here in Portland.
8      Q. Okay.
9      A. So --
10      Q. Okay. And then everything that's left
11  over, after all of these expenses, that equals the
12  Addendum A profits, and that is where your
13  percentage as a consultant for Orion came into play?
14      A. Yes.
15      Q. Okay. And you were supposed to get 50
16  percent of Addendum A profits for 2010, 2011, and
17  2012?
18      A. Correct.
19      Q. Okay. And then it drops down to 40 percent
20  for 2013, 2014?
21      A. Yes.
22      Q. Okay.
23      A. Plus there was another clause in the -- in
24  the -- in our consulting agreement that I would be
25  entitled to 50 percent for any new business that I

28

1  would bring in.
2      Q. Okay. And for how long?
3      A. For -- for the next three years. From the
4  time I bring it, for the next three years I would be
5  entitled to 50 percent.
6      Q. Okay. So, theoretically, if you brought in
7  new business on -- after the fourth year and 364
8  days you brought a new client to Orion, you would
9  still get three additional years of 50 percent of
10  the profit from -- from just that client?
11      A. Exactly. Yes.
12      Q. Okay. If you would turn back to Exhibit A,
13  Page 1. And that's Exhibit A to the complaint,
14  which is Exhibit 1.
15      A. Okay.
16      Q. Now, again, you testified that this
17  contract, this Agreement For Sale and Purchase of
18  Business Assets, replaced the earlier one that we
19  saw in Exhibit 19; is that correct?
20      A. Correct.
21      Q. Okay. And now we see that the buyer is
22  Orion Agency, LLC, correct?
23      A. Correct.
24      Q. Okay. Can you recall -- other than
25  changing the buyer to an LLC that now existed at

7 (Pages 25 to 28)

**29**

1  that time, were there any other changes to this
2  contract from Exhibit 19?  And I'm not asking for a
3  comparison.  I'm just asking -- we heard testimony
4  from Matt and Steve King that you had additional
5  concerns that you wanted the contract changed?
6     A.  Yes.  We had a lot of changes.  One, for
7  example, was how we were going to calculate the
8  expenses.  In other words, if we were going to
9  take -- you know, how much were they going to be
10  compensated for mileage, how much they're going to
11  be compensated for -- for traveling, how much they
12  were going to be compensated for accountants.  I
13  told them, I said, "I did all the accounting myself.
14  I don't feel that I should have to pay just because
15  you want to have an accountant to keep your books.
16  I kept my books for -- for ten years or 12 years by
17  myself, and I don't feel that I should have to pay."
18  I also said, "I don't want to have to be concerned
19  whether you drove for 200 miles for this particular
20  ship or you drove ten miles and how much you're
21  going to charge me."  So I said, "Why don't we" --
22  it was my proposal.  I said, "I will give you 27
23  percent for -- to take off from the top, 27 percent
24  for expenses, and" -- which was extremely generous
25  because their expenses never exceeded more than ten.

**30**

1  But I said, "I'll pay you 27, but I don't have to --
2  I don't have to bother about what you're going to
3  tell me your real expenses were."
4     And then there was another -- a couple of
5  other clauses that I wanted to have in this
6  contract.  One was that in the previous contract
7  they wanted to -- to protect themselves in case the
8  business would not do as much as we had done the
9  previous three years.  They said that, "If -- if the
10  business drops under 100,000 a year, you should not
11  be getting 50 percent."  And I said, "That's -- that
12  sounds fair.  But," I said, "if the business goes
13  the other way and if it makes more than $180,000,
14  then I should be compensated more than what I" -- so
15  these were some of the changes that we made from the
16  previous to this.
17     And, also, this one, it also -- there was a
18  provision where if I were to die or be incapacitated
19  before the end of the five years, that they will
20  continue to pay my -- my family.
21     Q.  Okay.  Thank you.
22     Looking at Page 8, please, and I think I
23  asked you for the consulting agreement, but looking
24  at Page 8, Exhibit A, that signature there under
25  "Consultant," or it's crossed out and says "Seller,"

**31**

1  is that your signature, sir?
2     A.  Yes, it is.
3     Q.  Okay.  And it's dated February 10th, 2011?
4     A.  Yes.
5     Q.  But the contract itself on the first page
6  says January 1st, 2010.  Did you back -- can you
7  recall if you backdated it so that it was clear that
8  you were replacing the old contract?
9     A.  Yes.  Exact -- that's exactly what we did.
10     Q.  Okay.  After this contract was signed -- or
11  I guess after the earlier one was signed, Orion was
12  now Matt and Steve's business; is that correct?
13     A.  They were -- they were the owners
14  officially.  However, since they hadn't paid me what
15  they owed me for the next five years, you would say
16  that I was still part owner.  I mean, that's how I
17  looked at it.
18     Q.  Okay.
19     A.  But -- but on paper, they were the owners.
20  They were the only owners.  But, you know, they owed
21  me money for the next five years, so I had a stake
22  at it, I guess.
23     Q.  Okay.  So -- but they could make decisions
24  for the business, whatever -- whatever decisions
25  they wanted to make, essentially.  I mean, is that

**32**

1  why you wanted to limit your exposure to their
2  expenses that you just discussed?
3     A.  Say that again.
4     MS. MATASARU:  Objection.
5     MR. HENDERSON:  That was a lot of
6  questions.
7     MS. MATASARU:  That's misstating prior
8  testimony and compound and -- go ahead.
9  BY MR. HENDERSON:  (Continuing)
10     Q.  Could Matt and Steve King make whatever
11  decisions they wanted to make as business owners for
12  Orion, in your mind, good, bad, or otherwise?
13     A.  I don't know, because we never came to the
14  point where they disagreed with what I suggested, so
15  I don't know if they could have or would have, you
16  know, done something that was -- that I strenuously
17  objected.  They testified that my participation was
18  vital for the survival of the company, so I think it
19  would have been very stupid for them to say, you
20  know, "We're just going to do whatever we want to
21  and we don't care what -- what your opinion is."
22     Q.  Sure.
23     You were there to consult with them and
24  advise them?
25     A.  Right.

8 (Pages 29 to 32)

33

1    Q.  Teach them the business?
2    **A.  Yes.**
3    Q.  Okay.  But they could do things like you
4 just testified about, like hire a bookkeeper that
5 you didn't do?
6    **A.  Yes.**
7    Q.  Okay.  And you disagreed with that idea, is
8 that what your testimony was?
9    **A.  Well, I disagreed if -- if I have to pay**
10 **for it to be taken out of my profits.  But if they**
11 **wanted to have a bookkeeper, as long as they paid**
12 **with the 27 percent that they were deducting for my**
13 **share of the revenue, I don't care what they did, so**
14 **that's what I told them.  "You do" -- I said, "You**
15 **do whatever you want."**
16    Q.  Because it's their business, right?
17    **A.  Exactly.**
18    Q.  Okay.
19    **A.  Yes.**
20    Q.  Okay.  Going back to -- I told you I'm
21 going to be somewhat lost.  Turning back to the
22 complaint, which is Exhibit 1 -- okay.  I'm going to
23 set that aside for a minute.  I'll come back.
24    **A.  Okay.**
25    Q.  After this -- the sale contract -- the

34

1 second sales contract was signed, how was business
2 going for Orion, in your opinion?
3    **A.  Oh, it was going very well.**
4    Q.  Okay.
5    **A.  The first year we had revenues of $175,000,**
6 **I believe.  The second year we -- we did 200,000, so**
7 **business was quite good.**
8    Q.  Okay.  And were you getting financial
9 statements for Orion at the time?
10    **A.  Not really financial statements.  What I**
11 **was getting is a copy of all the disbursement**
12 **accounts that they were sending out for every ship**
13 **so I knew exactly what the revenues were, and then**
14 **at the -- every six months, Steve will prepare a**
15 **list of all the ships that we had handled to that**
16 **point and show what the revenues, what the expenses**
17 **were -- how much we received from the owner, what**
18 **our revenues were, and I checked to make sure that**
19 **the ones that they were showing would match with the**
20 **disbursement accounts that I had a copy of.**
21    Q.  Okay.
22    **A.  But no other -- no other document.  No**
23 **balance sheet or anything like that.  I never**
24 **received anything like that, and I never asked.**
25    Q.  Okay.  Did you -- you were never given

35

1 financial statements.  Were you ever given bank
2 statements for the company?
3    **A.  No.**
4    Q.  Did you ever hear or can you recall having
5 discussions with Matt King about his financial
6 difficulties?
7    **A.  No.  My recollection is this, that I never**
8 **had a discussion.  We were at my house for a**
9 **meeting, because we had meetings every week,**
10 **either -- and we were usually alternating between my**
11 **house and Matt's house.  And in one of those**
12 **meetings in about the middle of 2012, Matt said to**
13 **me that he was considering filing bankruptcy, so**
14 **that was the first time that I heard.**
15    Q.  I'm sorry.  When was that?
16    **A.  About the middle, the summer of 2012.**
17    Q.  Summer of 2012.
18    **A.  And I never heard anything more about it.**
19    Q.  Did you talk to him about what was
20 happening or why he was thinking about filing
21 bankruptcy?
22    **A.  No.**
23    Q.  Okay.  Did he ever tell you that he had
24 sold his interest in Orion Agency, LLC, to his
25 brother?

36

1    A.  No.
2    Q.  First time you ever heard about that was
3 when you got some bankruptcy paperwork from Matt
4 King?
5    A.  Exactly.
6    Q.  Okay.  And that was in mid-2013?
7    A.  Yes.
8    Q.  Okay.  Were you ever an owner of Orion
9 Agency, LLC?
10    A.  No.
11    Q.  Were you ever an authorized signer on the
12 bank accounts held by Orion Agency, LLC?
13    A.  No.
14    Q.  Okay.  So if you -- this is probably an
15 obvious question, but you -- were you ever a joint
16 owner on any of the checking or savings accounts
17 held by Orion Agency, LLC?
18    A.  No.
19    Q.  And was it always Orion Agency, LLC, that
20 was supposed to pay your compensation under the
21 consulting agreement that we just looked at, Exhibit
22 A?
23    A.  I didn't really care where it came from.  I
24 suspect from -- from the company, whatever the name
25 was, Orion LLC, Orion Agency, LLC.  I was getting a

9  (Pages 33 to 36)

**37**

check every month, and it had the name "Orion" in
front of it, so, you know, my expectations was to
get a check from -- from the company.
   Q.  Okay.
   A.  Whether it was Orion Ship Agency or Orion
Agency didn't really matter to me.
   Q.  Okay.  But your contract was with the
company?
   A.  Sure.  Yeah.
        MR. HENDERSON:  Let's see here.  We'll go
off the record for just a second while I get my
bearings here.
        (Recess was taken:  1:48 p.m. -
        1:52 p.m.)
BY MR. HENDERSON:  (Continuing)
   Q.  Sir, will you please turn back to the
complaint, looking at paragraph 19, which is on page
6 of 10.
   A.  Oh, 6.  Okay.
   Q.  It says, "In late 2012 and early 2013,
Plaintiff Andreas approached Defendant and Steve
King about purchasing NASA.  Is that true, in your
opinion?
   A.  Absolutely.
   Q.  Okay.  Tell me how that worked.  Because

**38**

you heard testimony from Matt and Steve King --
   A.  Yes.
   Q.  -- that it was Steve King's idea to --
   A.  Yes.  I'm not going to sit her and perjure
myself like Matt did several times today.  What
happened was this:  About middle of December,
Stefanos Vertopoulos, who was -- yes.
   Q.  Would you spell that for the record?
   A.  Stefanos is S-T-E-F-A-N-O-S, Vertopoulos,
V-E-R-T-O-P-O-U-L-O-S, a mutual friend of Christos
Efthimiadis and myself, he told me that Christos was
going to have open-heart surgery, that his health
was failing, and that he had decided at this time to
sell NASA.  And he says, "I talked to Christos about
selling it to you" -- to me -- because 99 percent of
his clients are Greeks and it will only make sense
that somebody with Greek background buys the
company."  On about -- and he told me some of the
terms that -- that Christos wanted for the sale of
NASA.
   Q.  "He" being Stefanos?
   A.  Yes, Stefanos.
   Q.  Okay.
   A.  He told me that he wanted $150,000, $50,000
down and the balance to be paid within three years.

**39**

He says, "Would you be interested?"  And I said,
"Yeah, I think so."  But I couldn't make the
decision because I had to talk to Steve and Matt.
So I talked to both of them.  They were very
excited.  And on December the 20th, I believe it was
the 20th, might have been 19th or 20th, we had the
annual Christmas luncheon for the industry for the
agents.  And it was at the Red Lion Motel at Jantzen
Beach.
   Q.  And was that in 2012?
   A.  2012.
   Q.  Okay.
   A.  Yes, 2012.  Exactly.
        Christos was there and Steve was there and
I was there.  I talked to Christos, and I said, "I
understand that you are having some medical problems
and you have decided to sell the company.  Stefanos
told me that."  And I said, "Let's get together
after the holidays to talk about the terms."  He
says, "Yeah, let's do that."
        Then I went to Steve, and I said, "Steve,
why don't you go sit next to Christos and ask him if
he wants us -- if he wants you, Orion, to handle the
ships while he's going through this difficulties
with his -- with his health."  Steve did this.  He

**40**

sat next to him.  They had a conversation during
lunch.  He -- and he offered to -- to go to attend
the ships because he was not physically capable, and
then a couple days later they drove to Tacoma to
attend one of Christos' ships.  So this is how it
all started, and it was not that -- as Matt
testified and Steve testified yesterday, that it was
they who approached Christos first and he was so
excited about selling the company to them.
   Q.  Okay.  Thank you.
   A.  So --
   Q.  Still looking at paragraph 19, the third
sentence, it starts with "Instead"?
   A.  Uh-huh.
   Q.  "Defendant and Steve King intentionally
approached the seller's principal and tried to
convince him several times to sell NASA directly to
them."  Is that true?
   A.  Yes.  They also testified to this together.
I mean, today they testified that they tried to --
to go -- to buy the company on their own without me.
   Q.  Well, apart from their testimony, what
other information do you have that led you to make
this statement in paragraph 19?
   A.  Okay.  They met in the presence of Stefanos

10 (Pages 37 to 40)

41

1    Vertopoulos, and I don't -- I don't know if it was
2    both Steve and Matt or just Steve.
3    Q.  You weren't there.
4    A.  I wasn't there.
5    Q.  Okay.
6    A.  They met, and Steve -- Steve and Matt or
7    just Steve, because I don't know if Matt was there,
8    in the presence of Christos and, of course, Stefanos
9    Vertopoulos, they told him that -- or Steve told him
10   that he wanted to buy the company for themselves.
11   Then subsequent to that, about two months later --
12   Q.  Can I back you up real quick?
13   A.  Sure.
14   Q.  How do you know that information?
15   A.  I know it because Christos and Stefanos
16   told me that.
17   Q.  Both of them?
18   A.  Both of them.
19   Q.  Okay.  Please proceed.
20   A.  Then subsequent to that, Steve gave a
21   proposal in writing to Christos with his terms to
22   buy NASA, which did not include me.
23   Q.  Have you seen that writing?
24   A.  Yes.
25   Q.  Has it been produced?  Do you know?

42

1    A.  Yes.  Of course it has been.
2    MS. SCOTT:  Was it an e-mail?
3    THE WITNESS:  No.  No.  It was a letter,
4    letterhead.
5    MS. MATASARU:  I know it was produced in
6    the state case.  I'm not sure --
7    MS. SCOTT:  I will look.
8    MR. HENDERSON:  Okay.
9    MS. MATASARU:  Yeah.
10   MR. HENDERSON:  If it hasn't been, I'll
11   just request that it be produced.
12   MS. MATASARU:  Oh, sure.
13   MS. SCOTT:  I think we did.
14   MR. HENDERSON:  We can come back.  You guys
15   can look for it.
16   MS. SCOTT:  Sure.
17   MR. HENDERSON:  We can keep going.
18   BY MR. HENDERSON:  (Continuing)
19   Q.  Let's see here.  Still looking at paragraph
20   19, it later says, "Defendant and Steve King
21   expressly stated it was for the purpose of cutting
22   Plaintiff Andreas out of the deal so that they would
23   not have to pay him his share for profits of
24   bringing in new business."  Is that -- did you get
25   that information from Stefanos?

43

1    A.  No.  I got this information from their
2    father.
3    Q.  From Matt and Steve King's father?
4    A.  Matt and Steve's father, yes.
5    Q.  Okay.
6    A.  He did not exactly say -- you see, he did
7    not use these words, obviously.  But I was very
8    perplexed why -- for three months we were trying to
9    negotiate.  I made them the most generous offers so
10   that we could purchase -- purchase NASA, and they
11   turned down every single one of them.  We went to
12   mediation, and -- and they did not make me a
13   proposal.  I made them a very fair proposal.  The
14   mediator presented the offer, and he came back to
15   me, and he says -- he told me that they had rejected
16   it flatly.  And I said, "Are they going to make me a
17   proposal?"  And they -- he said, "No.  The only
18   thing that they want you to do is not to talk to
19   Christos."  And Matt perjured himself again today
20   because he said he did make me a proposal.  They did
21   not.  They did not make me a proposal.
22   Q.  Okay.
23   A.  So -- so -- and I found out from -- from
24   his father, because I was so perplexed why we had
25   wasted three months and they would not accept

44

1    anything.  So I called him one time and we went to
2    lunch, and -- and I said, "I just don't understand
3    what is going on.  Here they wanted -- they spent
4    $2500 to go to mediation and they did not make me a
5    proposal, so why did we -- why did they spend the
6    money and why have they turned all the proposals
7    down?"  And this is what his father told me, he
8    says, "Early enough Christos told them" -- this is
9    what the father tells me now.  Okay?  "Early enough
10   Christos told Matt and Steve that he would be proud
11   to sell the company to them."  "And -- and,
12   therefore," they thought, "if we -- if he will be
13   proud to sell it to them, why should we have Andy to
14   get 50 percent of the profits?"
15   Q.  Mike King told you that?
16   A.  Well, he told me that this is what -- what
17   Christos had -- had told Steve and Matt.
18   Q.  Okay.  And that's leading you to the
19   conclusion that's what they were thinking?
20   A.  That's right.
21   Q.  Okay.
22   A.  And then I put -- I put two and two
23   together that, obviously, this is why they were not
24   willing to agree to anything with me, because they
25   wanted to keep me out of the agreement.

11 (Pages 41 to 44)

**Exhibit 10 - Page 11 of 20**
Case 13-03249-tmb   Doc 30   Filed 04/08/14

45

1    Q.  Okay.
2      A.  And I -- and I sent a letter to his -- to
3    his father, and I talked to Christos about it, and
4    he says, "Well, yeah, I told them because I thought
5    that you still owned Orion and they were working
6    with you.  And I knew that they were doing fairly
7    good job, so, you know, it was -- I would have been
8    proud to have Orion and your part for Orion to" --
9    to sell NASA to me and the guys will be -- will be
10   doing the operations work.  But they misinterpreted
11   that "you," meaning Steve and Matt rather than --
12     Q.  Orion?
13     A.  -- Orion.
14     Q.  Okay.  So did Mike King tell you that Matt
15   and Steve expressly stated that it was for the
16   purpose of cutting you out of the deal?
17     A.  No.  He didn't use these words, but he --
18   this is what he told me.  He says, "I'm surprised
19   that they're stupid enough to think that they were
20   going to avoid paying you what you had coming from
21   your consulting agreement."
22     Q.  Okay.
23     A.  These were his words.
24     Q.  Okay.  Did anyone else, Stefanos or
25   Christos, tell you that Matt and Steve expressly

46

1    stated they were trying to cut you out of the deal?
2      A.  They did not use these words, but the --
3    the offer that he made in writing, it expressly says
4    that it is not -- you know, that Andy's not
5    included.  It doesn't say that, but it says that
6    he's going to be -- it's going to be bought by --
7    Orion.  And, of course, this is why they insisted
8    that they wanted to tell Christos that "Andy's not
9    owner of Orion, so that we can -- we can leave him
10   out." And then if Orion buys it, then Andy stays
11   out of it.
12     Q.  That's the conclusion you're coming to
13   based on the discussions you had with Mike King?
14     A.  Yes.  And -- and then also with Christos
15   and -- and Stefanos.
16     Q.  Okay.
17     A.  Christos told me that one -- once he found
18   out that I was not part of Orion and he was -- now
19   he was negotiating to buy -- to -- to -- for his
20   company to be purchased by Orion without me, he told
21   me, he says, "I wouldn't have sold it to them even
22   if they had offered me $400,000." He was asking for
23   150.  He says, "I wouldn't have sold it to them even
24   if they had made me an offer for 450." So --
25     Q.  Okay.  You told me a minute ago you made

47

1    them the most generous offers, made Matt and Steve
2    King generous offers to help them buy NASA; is that
3    correct?
4      A.  Correct.
5      Q.  Okay.  What were the offers?  Can you
6    recall?
7      A.  Yes.  The first offer that they -- well,
8    not the first.  Okay.  I'm not going to -- the first
9    offer that I thought it was very generous was at
10   some point they came to me and they said, "We want
11   to buy the company together."  Because before that I
12   had told them that, "Since you're not agreeing to
13   pay Christos what he wants and we don't want to lose
14   the deal and you don't want to pay because you think
15   it is risky," I said, "I'll buy the company."  And I
16   made them an offer, and I don't remember the terms
17   for that particular offer.  And Steve wrote me an
18   e-mail, and he says, "Yes.  I think, looking at your
19   proposal, it sounds fair.  Let's work out some
20   details.  Who's going to pay us for automobile?"
21   You probably have seen this message.  And I said,
22   "Okay."  I replied to some of those things, and I
23   said, "I'll tell Christos to prepare the contract
24   that will show that I am buying the company.  We
25   have to make" -- same message.  I said, "We have to

48

1    revise the noncompete clause."  And I said, "When I
2    come back from the Far East, we can discuss the
3    details."
4          When I came back from the Far East, we had
5    a meeting at Matt's house, and Steve says, "We don't
6    want you to buy the company; we want to buy it
7    50-50."  And I said, "Okay.  You put 75" -- I said,
8    "I'll make it easy for you."  I said, "I'll put the
9    50,000 that he wants.  You pay the $2,778 per month
10   for the next 18 months.  And then for the
11   following -- the remaining 18 months, we will split
12   the $1800" -- I mean, not 1800, "but the $2700,
13   we'll split it 50-50.  You pay half; I pay the other
14   half.  And then at the end of five years," I said,
15   "I'm going to sell you my $75,000 that I put in for
16   10." Steve goes, "I'm not giving you a dime.  Why
17   should I pay you anything?"  And I said, "Well, if
18   that's the case, why don't you give me your 75 --
19   your 50 percent.  Why don't you give me your 75,000,
20   I'll keep the whole company.  If my $75,000 are not
21   worth anything, then your 75,000 are not worth
22   anything."  That was one of the offers, which
23   I thought was very generous.
24     Q.  And I just want to ask one more quick
25   question.  When you said you made that offer to buy

49

1  the company 50-50, to buy NASA 50-50 --
2  **A. Yes.**
3  Q. -- was that you and Steve King or was that
4  you and Orion?
5  **A. Well, it was going to be not Steve King,**
6  **because I -- Steve King never acted as though he was**
7  **a separate entity. I mean, as far as I knew, Matt**
8  **was the president of the company, so it was going to**
9  **be Orion and me, that we were going to buy, and**
10 **Orion was Steve and Matt, with Matt being the**
11 **president of the company.**
12 Q. Okay. Thank you.
13    Any other offers that you can recall about
14 trying to help Orion purchase NASA?
15 **A. Yes. I made them the -- last offer that I**
16 **made them was that I was going to buy NASA. I**
17 **was -- and I was going to give them exactly the same**
18 **terms that they offered me the very first time, the**
19 **very first offer that they -- that they made. And I**
20 **said that, "After five years -- I'll put all the**
21 **money. After five years, I'll turn it over to you,**
22 **and I don't want anything. I mean, you don't have**
23 **to pay me anything." So I was going to put all**
24 **$150,000. I was going to pay them for five years,**
25 **and -- and I said, "In order to do this, we have**

50

1  **to -- you have to give me a letter that this will**
2  **not constitute a breach of our non-consulting**
3  **agreement." And they said, "Absolutely not. We're**
4  **not going to give you anything."**
5  Q. Okay. So, in your mind, back in late 2012,
6  2013, when Orion had the opportunity to purchase
7  NASA under the various offers you made, is it your
8  opinion that, based on the contract you had with
9  Orion, that Matt and Steve were obligated to accept
10 one of your offers?
11 **A. Say that again.**
12 Q. Sure. It was a long question and I'll try
13 to break it down.
14    In your opinion, when these discussions
15 were happening about buying NASA, were Matt and
16 Steve obligated to buy NASA?
17 **A. No.**
18 Q. And were they obligated to accept one of
19 your offers?
20 **A. If they -- if they wanted -- if they didn't**
21 **want to buy NASA, they didn't -- they were not**
22 **obligated. If they wanted to, if they wanted to buy**
23 **NASA, we had to agree on some terms how we were**
24 **going to buy the company. We -- they made**
25 **proposals. I made proposals. We just could not**

51

1  **agree. I mean, they would not agree on anything.**
2  **They were raising the bar every time. And, you**
3  **know, the bottom line is that if you want to buy the**
4  **company, you have to -- you have to be obligated to**
5  **agreeing with the terms. So if you're not**
6  **interested in buying the company, you have no**
7  **obligation.**
8  Q. Okay. Thank you.
9     If you would, please, turn to Exhibit 6,
10 which is in Volume 1. It might be in your second
11 Volume 1.
12 **A. Exhibit 6?**
13    MS. SCOTT: It's the whole book.
14 BY MR. HENDERSON: (Continuing)
15 Q. The whole book?
16    MS. SCOTT: So just wait until he tells
17 you.
18 BY MR. HENDERSON: (Continuing)
19 Q. It's marked at the bottom MKING000276.
20 **A. 276. Okay.**
21 Q. Okay. When you -- will you just review
22 this e-mail, please, and let me know when you --
23 **A. Okay.**
24 Q. Does this e-mail look familiar?
25 **A. Yes. I wrote it.**

52

1  Q. Okay. And it's an e-mail dated January
2  22nd, 2013?
3  **A. Correct.**
4  Q. And it's an e-mail to Steve and Matt King?
5  **A. Uh-huh.**
6  Q. Following up on a lunch you had with
7  Stefanos?
8  **A. Yes.**
9  Q. Can you tell me, what was this e-mail
10 about?
11 **A. Well, I'm sure telling them the**
12 **conversation that I had with Stefanos and what**
13 **Stefanos had told me about his personal feelings and**
14 **how we could get this thing to work. In other**
15 **words, this thing -- when I say "this thing," I mean**
16 **the purchase of NASA, how it would work for us.**
17 Q. Okay.
18 **A. So --**
19 Q. And at the last sentence -- or I guess the
20 two -- the last two sentences, it says, "From the
21 conversation that I had with Christos yesterday, I
22 agree he will nitpick everything because he worries
23 about everything." What do you mean by that? What
24 is he going to nitpick?
25 **A. Well, Christos was calling me three, four**

53

1    times a day telling me that Matt is incompetent. He
2    was screwing up all the time. And -- and he would
3    call me, as I said, three, four times a day, and --
4    which became, you know, annoyed -- I became annoyed.
5    And he -- I said nitpicking. He was, you know,
6    checking everything to make sure that everything is
7    done to his liking, and he certainly didn't like the
8    way Matt was -- was doing -- the way he was
9    performing handling his ships.
10    Q.  Okay. And the last sentence says, "I agree
11    with Stefanos, but it is your call."
12    A.  Uh-huh.
13    Q.  What did you mean by that statement, "it is
14    your call"?
15    A.  Well, it's your call with whether you want
16    to buy the company or not.
17    Q.  Okay. I'm going to try going
18    chronologically, but it might get out of order here,
19    so --
20    A.  Yeah. Let me -- let me also add to this.
21    Not only buy the company under the terms that
22    Christos wants and not the terms that you are
23    offering, which was percentage basis.
24    Q.  Okay. Thank you.
25         Please turn to MKING275. We're going

54

1    backwards in the book, but I think we're going
2    forward in time.
3    A.  Yeah. Okay.
4    Q.  Do you recognize this e-mail? It's an
5    e-mail dated January 22nd, 2013, 6:12 p.m.
6    A.  Yes. Of course, yeah.
7    Q.  Okay. And what's the basic gist of this
8    e-mail? Why were you sending this to Matt and
9    Steve?
10    A.  Well, I sent it to them because they were
11    not agreeing to pay Christos the terms that he --
12    that Christos wanted. I know Christos. He wanted
13    certain terms, and he wasn't going to budge. He
14    wasn't going to do anything. And they didn't want
15    to give him the down payment he wanted. They didn't
16    want to pay him the monthly payments. They wanted
17    to tie everything to -- to percentage basis. And,
18    therefore, I said, you know, "This is it. You are
19    either going to agree to his terms or we're going to
20    lose the deal," basically.
21    Q.  Okay. And, in your opinion, from what you
22    know with your discussions with Matt and Steve, did
23    they have the kind of cash to come up -- could they
24    come up with that kind of cash to pay Christos back
25    in early 2013?

55

1    A.  According to them, no.
2    Q.  Okay.
3    A.  I asked them. Matt -- Steve told me that
4    both of his homes that he owned -- that he owns were
5    underwater and he couldn't get a loan. Matt --
6    Matt, I don't remember what his response was, but he
7    did say to me -- because they were offering to pay
8    30,000 -- 25 to $30,000, and I said, "Well, where is
9    this going to come from?" And Matt says -- Matt
10    says, "I'm going to take it out of my 401(k) to pay
11    for that." So, you know, when you hear things like
12    that and you don't know that the person is not the
13    president of Orion anymore, you do not assume that
14    he's going to take $30,000 out of his 401(k), but
15    he's not -- he's not going to be one of the owners
16    of -- of NASA.
17    Q.  Okay. And when you heard that they
18    couldn't come up with that kind of cash, is that why
19    you were making offers like the ones we just
20    discussed where you would come up with the money?
21    A.  Yes. It was not only the cash that they
22    didn't have, but they were not also agreeing to pay
23    Christos the $2,778 every month for the next 36
24    months. They wanted to tie it to the -- to the
25    percentage basis, and Christos says, "No. What if

56

1    they screw up and a year later they will only have
2    50 percent of what I have been doing? Why should I
3    suffer because they screwed up?" So he wasn't
4    agreeing, so -- and I felt that they were fair
5    terms. So --
6    Q.  So is it fair to say that -- from your
7    discussions with Christos, that he was looking for
8    more of a -- of a -- like a loan or a promissory
9    note rather than a consulting agreement like you
10    had?
11    A.  Absolutely. He wanted a promissory note.
12    Q.  Okay. Still looking at MKING275, the last
13    two sentences, it says, "You guys talk and decide
14    what you want to do. If I owned Orion I would not
15    hesitate to accept $150,000 payable in three years."
16    Do you see that there?
17    A.  Yes.
18    Q.  Okay. So you were advising them on what
19    you thought was a good business decision?
20    A.  Exactly.
21    Q.  But ultimately the decision was theirs?
22    A.  Yes.
23    Q.  Is that correct?
24    A.  Yes.
25         MS. SCOTT: Nick, when you find a point,

14 (Pages 53 to 56)

57

1    I'd like to request a break.
2         MR. HENDERSON: We can break now. That's
3    fine.
4         MS. SCOTT: Oh, okay.
5         (Recess was taken: 2:19 p.m. -
6         2:29 p.m.)
7         (Reporter read back as requested.)
8    BY MR. HENDERSON: (Continuing)
9    Q.  Mr. Papachristopoulos, Orion ultimately did
10   not purchase NASA, correct?
11   A.  Correct.
12   Q.  Okay.  Who did purchase NASA?
13   A.  My son, Demitri.
14   Q.  Okay.  And did you provide any assistance
15   to your son to purchase NASA?
16   A.  No, I didn't.  And let me put it this way:
17   As I testified earlier, this offer was made to me
18   back in the middle of December.  Had I wanted to
19   assist my -- my son to buy NASA, I would have gone
20   to him instead of going to Steve and Matt.  That's
21   not what I did.  I went to Steve and Matt, and I
22   said, "Look, there's an opportunity here to buy this
23   company.  Are you interested?"  They said, "We're
24   very interested.  We're very excited."  So we spent
25   three months -- we wasted three months trying to

58

1    find a way to buy it.  And when everything fell
2    apart, I told Christos, I said, "You do whatever you
3    want to."  And he contacted my son, and he sold the
4    company to him.
5    Q.  Okay.  Would purchasing NASA have added any
6    additional risk for Matt and Steve King, in your
7    mind?
8    A.  What kind of risk?
9    Q.  Financial risk.
10   A.  If they had purchased NASA?
11   Q.  Correct.
12   A.  No.  It would have been -- no.  In my
13   opinion, it would have added to the revenues.  It
14   would have doubled, more or less, the revenues that
15   Orion had.  And I don't know that there were any
16   additional risks, unless they screwed up.  That's
17   the only time you can have risk.
18   Q.  Okay.  Well, I think I heard Steve King
19   testify that there was some concern that some of the
20   Christos' clients would leave after a sale of NASA?
21   A.  It was -- it was -- you know, there was --
22   there was nothing -- nothing to base that fear.
23   Absolute -- they didn't want to do it, and they
24   found all kind of excuses why they didn't want to
25   sell -- why they didn't want to buy it with the

59

1    terms that Christos wanted.  That's the bottom line.
2    Q.  Okay.  And I also -- I think I heard both
3    Matt and Steve King testify that this industry is
4    very relationship-centered?
5    A.  It is.  Absolutely.
6    Q.  Okay.  And so isn't it possible that if
7    Christos were to retire, some of his clients that he
8    had relationships with would leave NASA and go
9    somewhere else?
10   A.  This is the case whenever you buy any kind
11   of a company.  Regardless of whether it is a grocery
12   store or a shoe store, you might have a number of
13   clients who are regular customers and once
14   management changes, for one reason or another, they
15   will not continue.  And there is always a risk to --
16   when you buy, but they had no basis, because they
17   didn't know any of Christos' clients, to base that
18   fear that some of them might not come.  And the fact
19   of the matter is that my son has it and none of the
20   clients has left -- none of the NASA clients has
21   left.
22   Q.  Okay.  At this point are you performing any
23   services for NASA?
24   A.  Yes.  I'm helping NASA.
25   Q.  Okay.  Do you have a contract with NASA?

60

1    A.  Not a written one, no.
2    Q.  Okay.  Just an agreement with your son?
3    A.  Yes.
4    Q.  Okay.  What is that agreement?
5    A.  The agreement is that I will help him as
6    much as I can, because the volume was too high for
7    him to -- to do it by himself, and he is paying me
8    $2,000 a month.
9         MS. MATASARU:  I'm going to object to this
10   line of questioning.  How is this relevant to the
11   bankruptcy case?
12        MR. HENDERSON:  This would be relevant to
13   Mr. Papachristopoulos' claim for damages.
14        MS. MATASARU:  Uh-huh.
15        MR. HENDERSON:  We can go off the record.
16        MS. MATASARU:  Yeah.
17        (Discussion held off the record.)
18        (Reporter read back as requested.)
19   BY MR. HENDERSON:  (Continuing)
20   Q.  Okay.  Is the $2,000 per month payment the
21   full extent of your compensation from NASA?
22   A.  Yes.
23   Q.  There are no other percentage splits or
24   anything?
25   A.  No.

61

1    Q.  Okay.  Is NASA a larger company than Orion
2    was?
3    **A.  Yes.**
4    Q.  Has a higher volume of ships that it
5    services?
6    **A.  Yes.**
7    Q.  Larger revenues?
8    **A.  Yes.**
9    Q.  When did you and your son agree that you
10   would help him out as much as you can for $2,000 per
11   month?
12   **A.  Well, I think it was October of this**
13   **year -- of last year when I had received the letter**
14   **from Matt that he -- that I could not consider**
15   **myself as a part of Orion and that he had**
16   **disconnected my -- my phone and also the ability to**
17   **read the e-mail messages, and I was faced with the**
18   **prospects that for the next two years Orion was not**
19   **going to pay me for buying Orion.  And looking at my**
20   **options, I wasn't going to file bankruptcy like Matt**
21   **and quit paying my bills and I wasn't going to go**
22   **back to school at the age of 73 to start a new**
23   **career.  So while I was contemplating what I was**
24   **going to do, my son called, and he says, "Could you**
25   **help me out, because the volume is way too high for**

62

1    **me to handle?"  So --**
2    Q.  Okay.  Thank you.
3    Does anyone -- to your knowledge, does
4    anyone other than your son own an interest in NASA?
5    **A.  Nobody else, as far as I know.**
6    Q.  Okay.  Do you know what your son paid for
7    NASA?
8    **A.  He paid 150,000, same thing that what**
9    **Christos had offered to me and Orion.  Same terms**
10   **exactly.**
11   Q.  Okay.  And, Mr. Papachristopoulos, are you
12   familiar with Orion's financial condition?
13   **A.  Right now?**
14   Q.  Yes.
15   **A.  No.**
16   Q.  Were you familiar with it in 2013?
17   MS. MATASARU:  Objection; asked and
18   answered.
19   THE WITNESS:  Well, what do you mean by
20   "financial condition"?  I knew that they had funds
21   coming from ships.  I knew what the bills were, that
22   they had to pay, and I knew what the revenues were,
23   so that's -- I didn't know how much money they had
24   in the bank, no.
25   BY MR. HENDERSON:  (Continuing)

63

1    Q.  That was going to be my next question.
2    **A.  Okay.**
3    Q.  So in July of 2013, you didn't know how
4    much money Orion had in the bank?
5    **A.  No.**
6    Q.  Do you know if Orion has any debt?
7    **A.  I do not know.**
8    Q.  Okay.  Other than the debt that you're
9    claiming in this lawsuit?
10   **A.  Yes.**
11   Q.  In the complaint, sir, it says that -- and
12   I can turn to it if we need to, but it says that you
13   believe that Matt King was paid from Orion profits?
14   **A.  Yes.**
15   Q.  Is that your opinion?
16   **A.  Yes.**
17   Q.  Okay.  What's the basis for that belief?
18   **A.  Well, we saw checks that were written --**
19   **that he wrote at least two checks, two $4,000 checks**
20   **that he wrote to himself in July and August.**
21   Q.  Okay.  And so when you say that he was paid
22   from Orion profits, you just meant that he was paid
23   or that he was somehow given a cut of profit as an
24   owner?
25   **A.  No, that he was paid.**

64

1    Q.  Okay.  Has Matt King ever taken money from
2    a bank account that belongs to you?
3    **A.  No.**
4    Q.  Has Matt King ever taken any cash or
5    property that belongs to you?
6    **A.  No.**
7    Q.  I think you answered this earlier, so I
8    apologize, but have you ever given Matt King any
9    money to hold for you for safekeeping?
10   **A.  No.**
11   Q.  Okay.  How about Orion?  Do you have an
12   agreement with Orion that it would hold money that
13   belongs to you?
14   **A.  No.**
15   MS. MATASARU:  You mean other than the
16   money that's owed out of the purchase agreement?
17   MR. HENDERSON:  I'm just going to continue
18   with my questions.  Thanks.
19   BY MR. HENDERSON:  (Continuing)
20   Q.  So Orion owes you a debt, is your belief at
21   this point?
22   **A.  Yes.**
23   Q.  And it's your opinion that Orion should pay
24   you from its bank accounts; is that correct?
25   **A.  Yes.**

16  (Pages 61 to 64)

65

1    Q.  Did Matt King or Steve King ever promise to
2  guarantee the payments that were due to you under
3  the Orion consulting agreement?
4    **A.  Well, the Orion -- the consulting**
5  **agreement, in my opinion, doesn't -- doesn't have**
6  **any stipulations that they could -- they could pay**
7  **me if they want to or not.  It says that they should**
8  **pay me 50 percent of the profits for the three years**
9  **and 40 percent the next two years.  So --**
10    Q.  Okay.  Well, what I'm getting at is, if
11  Orion didn't have the money, is it your opinion that
12  the agreement, Exhibit A to the complaint, is it
13  your opinion that that document requires Steve and
14  Matt to get out their own checkbooks and pay them
15  themselves?
16    MS. SCOTT:  Objection; legal conclusion.
17    THE WITNESS:  Okay.  What --
18    MS. SCOTT:  You can still answer it.  I'm
19  sorry.
20    THE WITNESS:  Answer.  Okay.
21    You know, it depends what you mean by "they
22  didn't have the money."  If they -- if they had
23  profits that they squandered, then I feel that they
24  would still owe me what I have coming.  If there
25  were not enough profits to pay me, then the

66

1  agreement says that I was not going to get paid -- I
2  was only going to -- you know, I will get only the
3  50 percent of the net profits.  So if they didn't
4  have any money in the bank account, it means that
5  they squandered the money, the profits.  So if they
6  squandered it, yes, I think that they had an
7  obligation to pay me.
8    Q.  "They" meaning Matt and Steve King?
9    **A.  Matt and -- yes.**
10    Q.  Is there a distinction for you between who
11  owes you the money, Matt or Steve King, or Orion, or
12  is it all kind of the same?
13    **A.  Well, it's the same, I would say.**
14    Q.  Mr. Papachristopoulos, how often were you
15  paid by Orion?
16    **A.  Every month, except there were some**
17  **exceptions.**
18    Q.  Why would there be exceptions?
19    **A.  Because in 2012 I was drawing $4,000 a**
20  **month and we -- I realized that at the end of the**
21  **year there would not be enough profits for me to --**
22  **to get $4,000, so I did not get a check in December**
23  **of 2000 -- 2012 and not a check in 2000 -- in**
24  **January of 2013.**
25    Q.  Okay.  How is NASA doing today?

67

1    **A.  Oh, NASA, it's doing very well.**
2    Q.  Okay.  How much time do you think you spend
3  performing services for NASA?
4    **A.  It depends.  Depends on the month.  Depends**
5  **on the volume.  There were some -- there was one**
6  **month that we had many ships.  There are other**
7  **months that we had very few, so it just varies.**
8    Q.  Okay.  Do you think you're performing
9  more -- or strike that question.
10    Do you think you're working more hours for
11  NASA than you did for Orion?
12    **A.  No.  About the same.**
13    MR. HENDERSON:  I'm just going to go
14  through my notes here.  We can go off the record for
15  a second.
16    (Recess was taken:  2:49 p.m - 2:51
17    p.m.)
18    (EXB. 20, Typewritten calculations,
19    marked.)
20  BY MR. HENDERSON:  (Continuing)
21    Q.  Mr. Papachristopoulos, you've been handed a
22  document marked as Exhibit 20.  Do you recognize
23  this document, sir?
24    **A.  Yes, I do.  I prepared it.**
25    Q.  Okay.  What is this document?

68

1    **A.  This is the -- the 2013 list of the vessels**
2  **that NASA handled during 2013.  The -- not NASA,**
3  **Orion, excuse me, Orion -- to begin with, with the**
4  **actual revenue for the first -- for the first seven**
5  **ships, and then -- and then the -- an estimate of**
6  **the revenue for the last three.  And then also it**
7  **shows the revenue from NASA and the payments that I**
8  **received and just a calculation of what is my**
9  **estimate that Orion owes me for 2013.**
10    Q.  Okay.  So when you testified earlier that
11  you were owed somewhere between 15 and $17,000, the
12  number that I'm seeing in total due, 15,189.76?
13    **A.  Yes.**
14    Q.  Is it your testimony that is the amount
15  that you are owed under the consulting agreement
16  with Orion?
17    **A.  Yes.**
18    Q.  And you have not been paid that yet?
19    **A.  Yes.**
20    Q.  Okay.  And what is this accountant's fee?
21  I heard Steve King testify about that.  What is
22  that?
23    **A.  Well, accountant's fee is that during 2010**
24  **and 2011 Steve gave me a 1090, so I prepared my**
25  **taxes on the basis of the 1090 that he gave me.**

17 (Pages 65 to 68)

69

1  Then in 2012, in the middle of 2012, he decided that
2  he wanted to change the 1090, the number that he
3  gave me, because he said that he had done it
4  incorrectly.  So I sent him a message and I said, "I
5  have already submitted my taxes for 2010, 2011," and
6  I said, "Do you -- now I have to amend the taxes for
7  those two years."  So I said, "Do you have an
8  accountant that you want me to go to to help me
9  amend my taxes according to your -- to your new
10  1090 -- 1099?"  And he said, "No.  Go to -- to your
11  own."  So I went to my own and I had my taxes
12  amended, and he charged me $650.
13     Q.  And did Steve King agree to pay that?
14     A.  Yes.  And there was a message to that
15  effect that he agreed to pay it.
16     Q.  Okay.  And do you believe that Matthew King
17  owes you that $650?
18     A.  Well, not personally.  I mean, it is --
19  Orion owes me that.
20     Q.  Okay.  Well, would the same thing be true
21  with the 15,189.76?
22        MS. SCOTT:  Objection; legal conclusion.
23        THE WITNESS:  Say that again.
24  BY MR. HENDERSON:  (Continuing)
25     Q.  You just testified that you believe that

70

1  Orion and not Matt King personally owes you the $650
2  for the accountant's fee; is that correct?
3     A.  Well, yes.  Orion -- I don't know -- I --
4  yeah, Orion owes me the 650 and Orion owes me the
5  15,189.
6     Q.  And 76 cents?
7     A.  And 76 cents.
8     Q.  Okay.  Thank you.
9        (EXB. 21, E-mail to Orion-OPS from Mr.
10        Papachristopoulos dated 2-5-13,
11        marked.)
12  BY MR. HENDERSON:  (Continuing)
13     Q.  Mr. Papachristopoulos, I'm handing you a
14  document marked as Exhibit 21.  It appears to be an
15  e-mail from you Orion - OPS e-mail address?
16     A.  Uh-huh.
17     Q.  Dated February 5th, 2013.  Do you remember
18  sending this e-mail?
19     A.  Yes.
20     Q.  Okay.  And I'll represent to you -- it
21  doesn't have Bates numbers on the bottom, but I'll
22  represent to you that this second page of Exhibit 21
23  is the attachment that was attached to this e-mail.
24        MS. SCOTT:  Nick, can I just -- just a
25  moment.  The MKING263, was Page 1 of this Exhibit 21

71

1  already produced?
2        MR. HENDERSON:  We can go off the record
3  for a second.
4        (Discussion held off the record.)
5  BY MR. HENDERSON:  (Continuing)
6     Q.  Sir, do you recognize the second page of
7  Exhibit 21?
8     A.  Well, it's only part of it.  It's not the
9  whole page.  The top part is missing.
10     Q.  Well, what's on the -- what is this second
11  page?
12     A.  I don't know.  I mean, I can't --
13  obviously, something that I have sent, but I can't
14  see the top part so I don't know exactly what it is,
15  what it has on top of this page.
16     Q.  Okay.
17     A.  There is something on top of it, obviously.
18     Q.  Thank you.
19        Turn to Exhibit 6 for me.  We'll just move
20  on.
21        MS. SCOTT:  Which page?
22  BY MR. HENDERSON:  (Continuing)
23     Q.  266, please.  MKING266.
24     A.  Okay.
25     Q.  This is an e-mail dated February 4th, 2013,

72

1  sent from you to Steve King.  Do you recognize this
2  e-mail?
3     A.  266, did you say?
4     Q.  Yes, MKING266.
5     A.  Oh, sorry.
6        Yes.
7     Q.  Do you remember sending that e-mail?
8     A.  Yes.
9     Q.  Okay.  What is this e-mail about?
10     A.  This is an e-mail that I thought that we
11  were wrapping an agreement about how the purchase of
12  NASA was going to be done where I was going to buy
13  it under my name, I was going to have a contract
14  with Steve and Matt in return, and I spelled out the
15  terms to -- to Steve and Matt.  And Steve responded
16  that "wanted to get back to you," and he says here
17  that he, basically, agrees and he wanted to work out
18  some details.  And this was prior to my leaving for
19  the Far East, and because of the message that --
20  that Steve, how he responded, I told Christos to
21  prepare the contract -- to contact his attorney and
22  prepare the contract that will show that the buyer
23  will be Andy Papachristopoulos.  And I said, "What
24  we would need in order to do this, we have to -- we
25  have to amend the consulting agreement."

**Exhibit 10 - Page 18 of 20**
Case 13-03249-tmb   Doc 30   Filed 04/08/14

73

1    Q.  Okay.  The last paragraph says, "I don't
2  want your parents to know that I am buying NASA"?
3    A.  Right.
4    Q.  Why not?
5      MS. MATASARU:  Document speaks for itself.
6  BY MR. HENDERSON:  (Continuing)
7    Q.  Can you --
8    A.  Well, I'm explaining why.
9    Q.  Sure.
10   A.  Yeah.
11   Q.  Thank you.
12   A.  So --
13   Q.  Well, can you recall any particular reasons
14  why you couldn't just tell Mike King or Barbara
15  King, I think is -- is --
16   A.  Yeah, Barbara.
17   Q.  -- is the mother's name, that you guys were
18  changing your agreement?
19   A.  No.  I was not concerned about Mike and
20  Barbara.  I was concerned about my wife.  Because I
21  said here, "Barbara is going for tell my wife,
22  Kathy, because they walked every day together, and
23  my wife was going to say, "Why do you need at this
24  age to buy another company?"  So I didn't want to
25  start -- I said, "Let's -- don't tell them that I

74

1  bought it myself.  Just tell your parents that I --
2  that we bought it together."
3    Q.  Thank you.  I didn't know that Kathy was
4  your wife.  I probably could have figured that
5  out --
6    A.  Okay.
7    Q.  -- had I asked you that earlier.
8      If you would, please turn to MKING259.
9  There's an e-mail, it looks like, sent on March 2nd,
10  2013, at 3:08 a.m., from you.  Do you know -- do you
11  remember sending that e-mail?
12   A.  Yes.
13   Q.  Okay.  It says, "Christos and I would like
14  to have your decision this weekend because if you
15  are not interested to buy NASA, Jimmy will"?
16   A.  Yes.
17   Q.  What was the discussion that you had had
18  with Christos?  Looks like there was a discussion
19  immediately preceding this e-mail.
20   A.  Well, I think on March 1 Christos sent me
21  an e-mail, and he said -- we had agreed to sign the
22  agreement, the purchase agreement by March 1, and he
23  says, "I don't see that we're getting close to
24  purchasing.  Tell me what's going on, because if
25  you're not interested, I have other options."  So

75

1  this is --
2    Q.  And did Christos tell you that Jimmy, your
3  son, was one of those other parties that he could
4  buy the -- or he could sell the company to?
5    A.  Yes.
6    Q.  Okay.  Were things between you and Steve
7  and Matt King tense at this point on March 2nd?
8    A.  Yes.
9    Q.  Okay.  And was that tension based on the
10  difficulties you three had in getting Orion to
11  purchase NASA?
12   A.  Primarily, yes, and the fact that I felt
13  that every proposal that they were making to me, it
14  was a deliberate attempt to screw me, so I resented
15  that.
16   Q.  Okay.  Mr. Papachristopoulos, at the
17  beginning of this deposition you testified that you
18  were owed somewhere between 15 and $17,000 under the
19  consulting agreement; is that correct?
20   A.  Yes.
21   Q.  And another figure I think you said was in
22  the 200,000-plus range for damages related to Matt
23  and Steve's refusal to purchase NASA?
24   A.  Yes.
25   Q.  Are there any other reasons that you can

76

1  think of that my client owes you any money?
2    A.  Any other reasons?
3    Q.  Any other reasons than those two reasons?
4    A.  Well, I don't know if this is a reason, but
5  they owe me additional money because of the loss of
6  revenue for 2013, 2014, and also maybe '15 and '16
7  if I had brought -- and I brought -- every year I
8  brought new business, and I suspect I would have
9  brought new business in 2000 -- for Orion, I would
10  have brought new business in 2014, and that would
11  have extended until 2017, so there's additional
12  funds that I feel that I lost because of the --
13  because of what happened, because they did not buy
14  NASA, and because they decided to breach the
15  contract -- and not continue paying me for the
16  year 2013 and 2014 for buying Orion.
17   Q.  Okay.  So those additional moneys would be
18  due to you under the Orion consulting agreement?
19   A.  Yes.
20   Q.  Any other reasons that my client would owe
21  you any money?
22   A.  Not that I can think of.
23   Q.  I think we're done for today, sir.  You
24  will be provided a copy of the deposition transcript
25  that you can review.  If there are any corrections

Exhibit 10 - Page 19 of 20
Case 13-03249-tmb   Doc 30   Filed 04/08/14

77

1 or changes you need to make to your testimony, you
2 can do so. Just be aware that any changes you make
3 to your testimony, I will be able to point that out
4 at a later date and time.
5 **A. Okay.**
6 EXAMINATION BY MS. MATASARU:
7 Q. I have a question. You were just asked if
8 there's any other reason for money due to you, and
9 if I remember correctly the answer was for 2013 and
10 2014 for buying Orion, and we can have the court
11 reporter read it back.
12 MS. MATASARU: Could you go back and read
13 that answer to Mr. Henderson's question?
14 (Reporter read back as requested.)
15 BY MS. MATASARU: (Continuing)
16 Q. And my question is: When you say for 2013
17 and 2014 from buying Orion, was that due under your
18 consultant agreement or under the sales and purchase
19 agreement?
20 **A. I would have to review the sales and**
21 **consulting agreement. I believe it's the consulting**
22 **agreement. I believe, but I have to review it. I**
23 **don't know off the top of my head.**
24 MS. MATASARU: Okay. Okay.
25 Thank you.

78

1 MR. HENDERSON: That's all I have. You
2 asked earlier if I had any objection to form of the
3 deposition. Do you have any objections?
4 MS. SCOTT: No.
5 MS. MATASARU: No.
6 MR. HENDERSON: We're done.
7 (Deposition concluded at 3:09 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

79

1 STATE OF OREGON )
) ss.
2 COUNTY OF MULTNOMAH )
3 I, Amy A. Dalton, Court Reporter and Notary
4 Public, do hereby certify that ANDREAS
5 PAPACHRISTOPOULOS personally appeared before me at
6 the time and place mentioned in the caption herein;
7 that the witness was by me first duly sworn under
8 oath and examined upon oral interrogatories
9 propounded by counsel; that said examination,
10 together with the testimony of said witness, was
11 taken down by me in stenotype and thereafter reduced
12 to typewriting; and, that the foregoing transcript,
13 pages 1 to 78, both inclusive, contains a full, true
14 and correct record of all such testimony adduced and
15 oral proceedings had and of the whole thereof.
16 Witness my hand and notarial stamp at
17 Portland, Oregon, this 7th day of March, 2013.
18
19
20
21 _Amy A Dalton_
Amy A. Dalton
22 My commission expires 5-27-16
23
24
25

**Exhibit 10 - Page 20 of 20**
Case 13-03249-tmb    Doc 30    Filed 04/08/14